"BD" et al., Plaintiffs,

v.

Barbara A. DEBUONO, et al., Defendants.

"MM," et al., Plaintiffs,

v.

Susanne D. Kaplan, et al., Defendants.

"EE" et al., Plaintiffs,

v.

Barbara A. DeBuono, et al., Defendants.

"PP" et al., Plaintiffs,

v.

Susanne D. Kaplan, et al., Defendants.

Nos. 98 Civ. 0910(CM) (MDF), 98 Civ. 0972(CM) (MDF), 99 CIV. 10596(CM) (MDF), 99 CIV. 10597(CM) (MDF).

United States District Court, S.D. New York.

Jan. 15, 2000.

Denise T. DiPersio, Stuart M. Grant, Jay W. Eisenhofer, Grant & Eisenhofer, P.A., Wilmington, DE, Majorie E. Berman, Krantz & Berman, LLP, New York City, Michelle Rago, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, Mark J. Krum, Mary J. Krum, Philadelphia, PA, for BD, DD, AA, JJ and LL, Jeanette Collins, Jean Doe, Jane Doe, Jane Roe, MM, EE, PP and SS.

Thomas R. Scofield, Office of Atty. General, New York City, for Barbara A. De-Buono, George Diferdinando, Geraldine Bunn, Donna Noyes.

Kyle C. McGovern, Westchester county Attorney's Office, Alan D. Scheinkman, County Atty., White Plains, NY, for Susanne D. Kaplan, Patsy Yang-Lewis, Harold N. Adel, M.D., Westchester County Dept. of Health.

Jeffrey S. Dantowitz, Corp. Counsel of City of N.Y., New York City, for New York City Dept. of Mental Health, Mental Retardation and Alcoholism Services, City of New York.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs are suing Westchester County, the Westchester County Department of Health ("WCDOH") and certain of its ranking officials—Mark Rapoport, M.D. ("Rapoport"), Harold Adel, M.D. ("Adel"), Patsy Yang–Lewis ("Yang–Lewis") and Susanne D. Kaplan ("Kaplan") (collectively, the "County Defendants")—under Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, for violations of due process rights guaranteed to Plaintiffs by virtue of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1431 *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, and the New York Public Health Law, § 2540 *et seq.* (collectively, "the Acts"), and the Fifth and Fourteenth Amendments to the United States Constitution; and for violations of the Rehabilitation Act's prohibition against discrimination in federally funded programs. Specifically, Plaintiffs allege that County Defendants unlawfully implemented policies to prevent, discourage and limit the use of 1:1 Applied Behavior Analysis Therapy ("ABA Therapy") in the treatment of autistic/PDD children, and that through those policies, plaintiffs BB, DD, MM, EE, SS, and PP and their families were deprived of appropriate ABA therapy and suffered injury as a result. Plaintiffs seek a declaration that the acts of the County Defendants were unlawful and violated the Constitution, IDEA and the Rehabilitation Act. Plaintiffs also seek compensatory and punitive damages, costs and attorneys' fees.

On August 5, 2000, plaintiffs moved for summary judgement on the merits of the Section 1983 and Rehabilitation Act claims. On August 7, 2000, defendants cross-moved for summary judgment on a number of threshold issues, including statute of limitations, failure to exhaust administrative remedies, and mootness, and on the merits of the Section 1983 and Rehabilitation Act claims.

For the reasons stated below, I:(1) deny the motion to dismiss plaintiffs' § 1983 and Rehabilitation Act claims on statute of limitations grounds; (2) deny the motion to dismiss plaintiffs' § 1983 and Rehabilitation Act claims on exhaustion grounds; (3) deny the motion to dismiss plaintiffs'

claims for declaratory relief under § 1983; (4) grant defendants' motion to dismiss the § 1983 claims of MM, DD and their parents; (3) grant defendants' motion to dismiss plaintiffs' § 1983 damages claims as to Adel and Rapoport and deny the motion as to Kaplan and Yang–Lewis; (4) grant defendants' motion to dismiss plaintiffs' Rehabilitation Act claims against all individual defendants Kaplan, Yang–Lewis, Adel, and Rapoport; (5) deny the motions for summary judgment on plaintiffs' remaining § 1983 and Rehabilitation Act claims.

## BACKGROUND

### Introduction

Plaintiffs BD, DD, MM, EE, PP and SS are children diagnosed with autism or pervasive developmental disorder ("PDD"), and plaintiffs Jean Doe, Jane Doe, Gary S. Mayerson. ("Mayerson"), Kit Weintraub ("Weintraub") and June Duessel (PP and SS) ("Duessel") are their respective parents.[1] During the period from 1993 through 1996, plaintiff children were enrolled in Westchester County's Early Intervention Program ("EIP"), which offers services to infants (ages birth to approximately three years old) with disabilities. Under this program, each child received a different "package" of services, which I describe below. These services were provided to the children under the requirements of IDEA and the New York Public Health Law.

1. The *BD* action is comprised of plaintiffs BD, Jean Doe, DD and Jane Doe. The claims of *BD* plaintiffs AA and Jane Roe were voluntarily dismissed without prejudice by the Court on February 28, 2000. The *MM* action is comprised of plaintiffs MM and Mayerson. The *EE* action is comprised of plaintiffs EE and Weintraub. The *PP* action is comprised of plaintiffs PP, SS, and Duessel.

2. The Education of the Handicapped Act ("EHA"), originally enacted in 1970, was renamed as the IDEA in 1990.

### Statutory and Regulatory Background

The IDEA was enacted to ensure that all children with disabilities have available to them a "free appropriate public education" (FAPE). 20 USC § 1400(d)(1)(A).[2] Under this Act, federal funds are provided to the states conditioned upon the provision of early intervention services to developmentally disabled infants and toddlers, i.e. children from birth up to three years of age. 20 U.S.C. § 1431 *et seq.*

The IDEA defines "early intervention services" as developmental services which: (1) are provided at no cost (except where otherwise provided), (2) are designed to meet the developmental needs of an infant or toddler with a disability, (3) meet the standards of the; state, (4) are to be provided by qualified personnel, and (5) to the extent appropriate, are provided in natural environments (e.g., home, community settings). 20 U.S.C. § 1432(4)(B)–(G). As part of these early intervention services, the child must be provided with an individualized family service plan ("IFSP") with the parents' involvement. 20 U.S.C. § 1436(a)(3), (d)(8).

Pursuant to this mandate, New York State enacted § 2540 *et seq.* of the Public Health Law, which establishes an EIP for infants and toddlers.[3] Every child eligible for early intervention services in New York is required to be evaluated; this evaluation includes an assessment of the unique needs of the child and the identification of services appropriate to meet those needs. N.Y.Pub. Health Law § 2544. Early intervention services are

3. Disabled children aged three to five years are not eligible for services under the early intervention program. These children receive services under a separate program referred to as the "Pre–K" program run by the New York State Department of Education and provided through local school districts. *See* 20 U.S.C. § 1419 and N.Y.Pub Health Law § 2541(8)(b). Depending on their birthdays, however, some children may be eligible to remain in the EIP to age 42 months. (See 9/21/00 DiPersio Decl. at Exh. 1 at 43–45.)

provided by the County, through its Department of Health.

Once a child is deemed eligible for early intervention services, New York Law requires that an Individualized Family Service Plan (IFSP) be created by the designated educational agency to offer services to each eligible child. The IFSP includes a statement of the specific early intervention services necessary to meet the unique needs of the child and the child's family. § 2545.

According to New York State Department of Health (N.Y.SDOH) regulations, providers of early intervention services must be certified by New York State. *See Malkentzos v. DeBuono*, 923 F.Supp. 505 (S.D.N.Y.), *vacated on other grounds by* 102 F.3d 50, (2d Cir.1996). In 1993, when Westchester County's Early Intervention program began, New York State did not provide guidelines describing what early intervention services are appropriate for infants with autism. The state had begun considering such guidelines by 1996.[4] *See id.*

*Autism and Applied Behavior Analysis*

According to the Autism Society of America:

Autism is a complex developmental disability that typically appears during the first three years of life. The result of a neurological disorder that affects the functioning of the brain, autism and its associated behaviors have been estimated to occur in as many as 1 in 500 individuals. Autism impacts the normal development of the brain in the areas of social interaction and communication skills. Children and adults with autism typically have difficulties in verbal and non-verbal communication, social interactions, and leisure or play activities. The disorder makes it hard for them to communicate with others and relate to the outside world. In some cases, aggressive and/or self-injurious behavior may be present. Persons with autism may exhibit repeated body movements (hand flapping, rocking), unusual responses to people or attachments to objects and resistance to changes in routines. Individuals may also experience sensitivities in the five senses of sight, hearing, touch, smell, and taste.

Autism Society of America Homepage, <http://www.autism-society.org> (visited Dec. 8, 2000) (citation omitted).

Autism is a disability within the meaning of the IDEA, thereby entitling children diagnosed with autism and PDD to the special services and education provided by this statute. 20 U.S.C. §§ 1401(1)(1)(A), (B); 1472(1).

ABA therapy instructs autistic/PDD children how to play, interact and perform basic skills by teaching small, measurable units of behavior systematically one-on-one with the child and a therapist/instructor. (8/5/00 DiPersio Decl. at Exh. 1 at 4; Exh. 2 at 3–4.)

Plaintiffs' expert Dr. Richard M. Foxx, Ph.D, in describing the goals of the therapy, has written that it "seeks to construct socially and educationally useful repertoires and decrease or reduce problem behaviors through the use of specific, carefully programmed environmental interventions." (Id.) The child is taught tasks in small steps through various methods, including reinforcement, shaping, fading, prompting, and maintenance strategies. Each child's program is unique, and the repertoires are repeated many times. Under this program the child should ultimately move from one-to-one instruction to small and then larger groups of children. (Id.)

4. The State has since adopted a recommended minimum of twenty hours per week of ABA therapy. *See* New York State Department of Health Early Intervention Program, Clinical Practice Guidelines, Report of the Recommendations, Autism/PDD, Assessment and Intervention for Young Children (Age 0–3 yrs): Behavioral and Educational Approaches, *available at* http://www.health.state.ny.us/nysdoh/eip/menu.htm, (last visited Dec. 22, 2000).

Plaintiffs claim that, as early as 1985, there was scientific evidence that ABA was successful in treating young children with autism. In that year, a study published by the Princeton Child Development Institute ("PCDI") showed that approximately 67% of children under the age of five who received approximately 27.5 hours per week of 1:1 ABA therapy for approximately two years were able to "function independently" in a regular classroom. (Id. at Exh. 2 at 5.) Plaintiffs argue that these results were confirmed in a study conducted by Dr. O. Ivar Lovaas in 1987, which demonstrated that approximately 47% of an experimental group of children under four years of age receiving 40 hours per week of 1:1 ABA therapy were able to mainstream into classes for typically developed children and to be considered indistinguishable from their peers. (Id. at Exh. 1 at 4; Exh. 2 at 5.)

Specifically, the Lovaas study demonstrated that 9 of 19 children with autism who, before the age of four, began receiving an average of 2.5 years of intensive home-based behavioral intervention (40 hours per week, year-round, delivered by trained therapists and parents in a 1–to–1 format initially), achieved an average IQ gain of 37 points and completely normal functioning in all domains by the time they were 6–7 years old. Comparison groups of similar children with autism who received ten hours a week of behavioral intervention or standard non-behavioral interventions made few significant improvements. (Id. at Exh. 4.)

Plaintiffs claim that the Lovaas study and subsequent studies building on Lovaas' findings confirm that the beneficial effects of a large number of hours of ABA therapy per week were accepted, well-known, and accessible by 1993 and through 1996 (the period when plaintiff children were enrolled in the EIP.) (Id. at Exh. 1 at 6–7.) Plaintiffs' experts insist that ABA therapy is the only therapy autistic/PDD children should receive. One of these experts, Dr. Gina Green, Ph.D., stated that providing any other therapy to EIP participants would be "unethical" and "a waste of taxpayers' money." (Granahan Aff. at Exh. 21 at 54, 55, 57 ("Green Dep.").) [5]

Defendants disagree with Plaintiffs' characterizations. First, they argue that Lovaas' finding have been criticized. Defendants' experts testified that Lovaas did not randomly assign his subject in his studies, nor did he compare different treatments, two important NIH guidelines for conducting behavioral studies (Granahan Aff. at Exh. 14 at 118–121) ("Hertzig Dep."); Exh. 35 at 87–89 ("Gresham Dep."), that the 1987 Lovaas subjects averaged 34–35 months in age, and were neither academically nor socially measured, and that Lovaas consistently tracked only I.Q. scores in the 1987 study and a 1993 follow-up, not cognitive or social skills. (Gresham Dep at 74–75.) Among the available literature, defendants point to (1) a 1996 article in the *Journal of Autism and Developmental Disorders* urging caution about the "enthusiastic" claims made for the gains associated with Lovaas therapy, (2) criticisms of Lovaas therapy from

5. Indeed, it is interesting to note that in 1996, Judge Motley of this district made the finding that "There are several educational modalities for autistic children, but ABA therapy is the only one that enjoys any quantifiable success." *Malkentzos v. DeBuono*, 923 F.Supp. at 509. Judge Motley also discussed New York City's provision of services to autistic children:

> [T]he only services available to [autistic children] are those created for otherwise developmentally disabled children. Clearly, such an arrangement is expedient for the City. However, serious question exists about whether any benefit whatsoever is derived from placing autistic children in the sort of structured-play environment routinely used with disabled children. Such placement ignores the special difficulties of autistic infants and children and can harm their development.

*Id.* at 509–10 (citations to hearing transcript omitted). The parties dispute the extent to which this view of ABA therapy was accepted in the medical and service provider communities from 1993 until 1996.

the editor of that Journal; (3) a 1995 special bulletin on discreet trail training (a phrase sometimes used to describe a type of applied behavior analysis that can include Lovaas therapy), warning of negative effects from the treatment. (Granahan Aff. at Exh. 47, 51, 42.)

Second, defendants deny that ABA is the only appropriate therapy, or that it is the "treatment of choice" for autism. Rather, they assert that ABA is a potentially beneficial therapy out of many beneficial therapies, and that during the relevant period WCDOH staff were aware of a number of possible treatment methods. (See Green Dep. at 34–36; Granahan Aff. at Exh. 1 at 60 ("Kaplan Dep. II"); Exh. 27 at 11 ("Galante Dep. III"); Exh. 2 at 33–34, 57–59 ("Graubard Dep. II"); Exh. 20 at 24–25, 43–44 ("Coiro Dep. II").)

At the very least, defendants argue that the beneficial effects of the therapy were by no means clearly established at the time of plaintiffs' participation in EIP. A number of WCDOH employees testified in depositions that at the time they were uncertain about how much of the therapy to provide, and that the Lovaas study was controversial. (See Kaplan Dep. II at 94; Graubard Dep. II at 33.) Those employees' research files contained articles on ABA, some that criticized application of the approach to very young children, and some that claimed the Lovaas studies' sample groups may have been biased toward higher functioning children. (See, e.g., id. at Exh. 30). Defendants also note that in 1993, even plaintiffs' expert Dr. Foxx said in an article in the *American Journal of Mental Retardation* that he would "withhold judgement until independent verification has been provided." (Id. at Exh. 50.)

*Early Intervention Services Provided to Plaintiffs*

During the relevant time period, the County did approve and provide some

ABA therapy to autistic children enrolled in the EIP. The nature and extent of each Plaintiff child's program is described below.

1. BD

BD, the son of Jean Doe, was born May 9, 1992. In January 1995, when BD was approximately 2 ¾ years old, he had been displaying self-stimulatory and aggressive behavior and had stopped verbalizing for several months. Doe contacted WCDOH to have BD evaluated. BD was diagnosed with autism in late March or April 1995 (Murphy Aff. at Exh. 6 at 14 ("Jean Doe Dep. III").)

Pursuant to his April 10, 1995 IFSP, BD was enrolled in the Putnam Associated Resource Center ("PARC") Preschool in Mahopac Falls, New York, on or about April 26, 1995, for three days per week. Jean Doe's understanding at BD's IFSP meeting was that PARC was the only place that had a place for BD. (Id. at 66.)

The parties dispute whether BD's initial IFSP provided for any center-based or home-based ABA therapy. The IFSP "summary sheet," under the heading "service type," lists "special instruction" for three 2.5 hour sessions at PARC, and two forty-five minute sessions at home. (8/5/00 DiPersio Decl. at Exh. 5 ("BD IFSP").) The term "special instruction" is a paperwork designation referring to ABA (See 8/5/00 DiPersio Decl. at Exh. 18 at 120 ("Galante Dep.").) Defendants argue that this notation means that BD's IFSP authorized three one hundred fifty minute sessions of center-based special instruction (ABA therapy) and two forty-five minute sessions of home-based ABA therapy. Plaintiffs dispute that the IFSP specifically provided for ABA therapy.[6]

BD's home sessions began in April, shortly after the initial IFSP. Doe testified that she noticed an improvement in BD

---

**6.** They claim BD's IFSP authorized the following: 30 minutes of speech therapy twice a week; 30 minutes of occupational therapy three times a week; 45 minutes of special education three times a week.

during his two 45 minutes special education sessions while the special education teacher was with him, but that BD's behavior was continuing to deteriorate at other times. According to Doe, she learned that BD's special education teacher was familiar with behavior modification therapy and was using those techniques in her sessions with BD. (9/21/00 DiPersio Decl. at Exh. 24 at 81–84 ("Jean Doe Dep. II").) She stated that the teacher spoke of a "behavioral approach," not ABA in particular, and that at no time in her discussions with therapists or county officials were the terms "ABA" or "Lovaas therapy" used. (Id. at 84, 88.)

Defendants claim that Doe asked that BD be removed from PARC Preschool at the end of the year. Plaintiffs dispute this. Doe testifies that BD significantly improved while working with the special education teacher, and as a result she asked her service coordinator for more special education services during the summer of 1995 that would include behavioral therapy. When her service coordinator asked her how much she wanted, Doe testified that she asked for six hours. She stated that was afraid to ask for too much for fear that they would deny her the services, and that she trusted her service coordinator to help her understand what to do to help her son. (Jean Doe Dep. U. at 102–03.) In the summer of 1995, BD received three two-hour at-home sessions with the special education teacher. (Jean Doe Dep. III at 92–93; BD IFSP.)

Doe did not privately fund any additional services for BD from April 1995 through August 31, 1995. (Jean Doe Dep. III at 113.) BD transitioned out of the EIP on August 31, 1995, and entered a preschool program in fall 1995. (Id. at 94.) In January 1996, after BD had aged out of the EIP, Doe attended a parent support group, where she learned about ABA therapy. (Id. at 113–117.)

## 2. DD

DD was born on February 27, 1994. DD's mother, Jane Doe, noticed that DD was losing some of his abilities as he approached his second birthday. He was diagnosed with autism/PDD in. April 1996. (Granahan Aff. at Exh. 6, at 15–16 ("Jane Doe Dep. III").) Following the recommendation of a neurologist, who told Doe that it was important to get DD to talk, Doe contacted Elyse Kaufman, WCDOH Service Coordinator, and requested speech therapy for DD. (9/21/00 DiPersio Decl. at Exh. 5 at 44 ("Jane Doe Dep.").)

DD's May 2, 1996 IFSP provided for 45 minutes of speech therapy, occupational therapy and special education two times a week. DD's parents signed the IFSP. (Id. at 44–45.) A County special education teacher began home-based services May 20, 1996. (Jane Doe Dep. III at 29.) Doe testified that at that time she was not aware of ABA therapy, and she did not ask the County to provide the therapy as part of DD's IFSP. She stated that DD's special education teacher told Doe about a parent who was doing ABA therapy with her autistic child. Doe contacted this parent, who helped Doe begin ten hours of home-based ABA therapy per week at the end of May 1996. Doe paid for the therapy herself. (Jane Doe Dep. at 45.)

The complaint alleges that when Doe told Kaufman of her plans to increase DD's therapy to 40 hours per week, and requested that the County reimburse her for the cost, Kaufman replied that ten hours of therapy was the maximum allowed and that there was "no way" WCDOH would provide 40 hours for DD. It also alleges that after Doe insisted on payment for the "maximum" ten hours of therapy and threatened legal action, Kaufman thereafter informed Doe that she had been "bumped up" to ten hours. (Compl. at 27). There is no evidence in the record that these conversations took place. However, DD's IFSP does indicate a change in service allocating ten hours of ABA therapy beginning July 1, 1996. (9/21/00 DiPersio Decl. at Exh. 6 at WC 07138.)

In July 1996, Janice Graubard, Ms. Kaufman's supervisor, visited Doe at Doe' home to ask Doe why she was unhappy with WCDOH. Doe taped the conversation, in which Graubard stated to Doe that "what we have [DD] at right now is, as you know, is what our maximum allowable is." (8/6/00 DiPersio Decl. at Exh. 6 at 3.) She also stated that "the decision for you to receive ABA was yours." (Id. at 6.) Graubard explained that part of the reason for starting at two or three hours of ABA a week was to make sure the child could tolerate the therapy, because for some children "it could take months before they can tolerate more than the initial amounts." (Id. at 4.) To this Doe responded, "in this household that is just out and about wrong." (Id.) She explicitly stated that DD was not stressed, that he was a child with plenty of energy, and pointed out that "regular kids can get absorbed in something for hours." (Id. at 7–8.) Doe explained that the therapy was working for her son, and that she wanted the County to pay for more hours. (Id. at 8–9.)

Doe continued to fund DD's ABA therapy herself. In August 1996 Doe requested mediation in an attempt to receive reimbursement for the hours of privately provided ABA therapy and to receive additional hours from the County. (Jane Doe Dep. at 76.) DD's mediation was held on September 6, 1996. Despite defendants' contention that Doe was offered twenty hours of ABA in this mediation, which she refused, the facts clearly show that she was offered ten hours of ABA and ten hours of "family training." Doe explained she rejected this offer because she had already been trained by her private therapist and felt this was time that should be spend on DD's therapy.[7] (Id. at 76, 11, 110–112.)

Defendants also contend that after a doctor told Jane Doe that DD had "recovered" from autism in October 1996, Doe

discontinued ABA therapy. Doe testified, however, that while she decreased the amount of therapy to between 24–30 hours per week because of DD's progress, at the time she did not agree with Dr. Cohen's statement that DD had recovered from autism/PDD. The understanding was that if it DD's progress slowed or began to reverse the hours would be re-instated immediately. (Id. at 132–134.) Doe made a handwritten notation on DD's IFSP:

> This IFSP was granted after my initial request on 10/16/96 was denied. Since my rights were violated I want to state for the record that prior to Dr. Cohen's evaluation of my son I sought 2 – 45 min. sessions [occupational therapy]/week / 2–45 min sessions of speech/week and *40* hrs of Applied behavior Analysis (34 hrs of ABA has been privately funded by me). Since Dr. Cohen's evaluation and advice, I am now seeking a *minimum* of 3 hrs of speech/week, 2 hrs of [occupational therapy]/week and 30 hrs of ABA/week (30 hrs also presently funded by me). I am also requesting the E.I. fund my son's socialization skills through incidental learning. I signed all previous IFSP's because I did not want my son to be denied any services, albeit *inappropriate.*

(8/5/00 DiPersio Decl. at Exh. 8.)

DD transitioned out of the early intervention program in January 1997. In February 1998, the County entered a stipulation with Doe whereby the County agreed to reimburse Doe for the costs of the privately funded ABA therapy she had provided to DD. (Murphy Aff. at Exh. 9 at 129, 144–46 ("Jane Doe Dep. II").)

### 3. MM

The following facts are related in an April 3, 1997 decision on *In the Matter of Gary S. Mayerson & Lilli Z. Mayerson,*

---

7. Defendants' characterization of this and other similarly structured "20 hour" offers is both disingenuous and misleading.

*Petitioners, on behalf of MM, Child,* following a hearing in front of New York Department of Health Administrative Law Judge G. Liepshutz (attached to 9/21/00 DiPersio Decl. as Exh. 9.) ("*Mayerson* Decision."). Mayerson requested this hearing with the Department of Health on September 5, 1996, seeking reimbursement for the costs of services and counsel fees.[8]

MM, son of Gary Mayerson, was born on March 22, 1994. After MM's parents noticed behavior changes, they contacted Sue Ann Galante of WCDOH. The Children's School for Early Development evaluated MM. He was diagnosed with mild to moderate autism on or about June 5, 1996. Sue Ann Galante became MM's initial service coordinator. (Id. at 2–3.)

MM's proposed initial IFSP included eight hours per week of one-to-one ABA therapy provided at home (four times per week for two hours), family training for two hours per month, one 1.5 hour session of speech and language therapy, and one forty-five minute session of occupational therapy per week. (Id. at 3.)

Judge Liepshuz found that ABA therapy was appropriate intervention for MM, and that the first proposed IFSP was inappropriate, because it did not provide an adequate number of hours of ABA or speech therapy. (Id. at 34.)

MM's parents rejected this proposed IFSP, and began to set up a home-based ABA therapy program for MM. (Id. at 4.) At the end of June 1996, MM's mother contacted Judith Palazzo to coordinate this program, and on July 5, 1996, a group of ABA instructors began to set up his program. Judge Liepshutz found that this team "was an excellent group of people who are very, very well *trained*," and pointed out that home-based ABA instructors do not have to be certified special education teachers for the program to be successful. (Id. at 4–5.)

The Judge found that the County "generally did not try to find service providers for a child such as MM before his parents agreed to an IFSP." He did note, however, that starting on June 24, 2996, Galante started to try to locate ABA therapists for MM's in-home program, and was unable to locate anyone who was immediately available. (Id. at 5.)

Beginning in July, MM received more than ten hours of ABA therapy per week. By the end of October 1996, he was receiving 25 to 30 hours a week, and by the middle of December, MM was receiving 32 hours per week. His sessions were two hours in length. The ALJ found that 32 to 40 hours per week of ABA was appropriate for MM. (Id. at 5–6.)

MM's second IFSP meeting was held on July 23, 1996. The County offered ten hours of at home ABA instruction per week (five sessions for two hours each), two hours a week of family training, two sessions of 45 minutes of speech therapy per week, two sessions of 45 minutes of occupational therapy, and one session per month of "collaboration" with ABA staff and/or occupational therapist. (Id. at 6–7.)

The ALJ found that the home ABA component of the second proposed IFSP was not appropriate, because it did not indicate enough hours, and that the therapy MM continued to receive from his team was appropriate (Id. at 7.)

The Mayersons consented to the speech therapy and occupational therapy provisions of the home-based option of the second IFSP, but only to those options, by letter dated August 12, 1996. On September 5, 1996, the County offered a third IFSP to the Mayersons, consisting of ten hours per week of ABA and ten hours per week of family training, speech and occupational therapy and family counseling. (Id. at 7–8.) The ALJ found these numbers inadequate, and stated that "[i]t was

---

8. Mayerson requested the hearing following an August 29, 1996 mediation between May- erson and the County, which concluded without resolution. (*Mayerson* Decision at 1.)

not realistic or appropriate for his family to act as his therapists." (Id. at 8.)

After five months of ABA therapy, the court found that MM had made "considerable and excellent progress," and "was able to speak and express himself much more effectively." (Id. at 8.) The court determined that from July 5, 1996 through December 30, 1996, the Mayersons paid a total of $20,287.50 to the ABA providers, and spent approximately $2,000 on other early intervention services and materials. (Id. at 9–10.) At the time, the County paid its certified personnel $90 for each extended home-based visit (any visit of at least 60 minutes). (Id. at 9.) The Mayersons were reimbursed $22,184.59, and the County was ordered to reimburse the Mayersons to the extent that they incurred future expenses while MM was still receiving early intervention services through August 31, 1997. (Id. at 16.)

### 4. PP

June Duessel is the mother of two developmentally disabled children, PP and SS. PP was born on February 2, 1991 and diagnosed with PDD on August 31, 1993. PP was evaluated by a speech/language therapist, developmental pediatrician, psychiatrist and psychologist. The psychologist, WCDOH representative Hannah Carroll, and PP's mother attended PP's IFSP meeting. (9/21/00 DiPersio Decl. at Exh. 10 at 41, 52–53, 65–66 ("Duessel Dep.").)

PP's October 25, 1993 IFSP provided for services at the Children's School for Early Development. His five-day-a-week program provided for five and one-half hours of combined special education, physical therapy and speech therapy. (Granahan Aff. at Exh. 8 at 38, 41, 56, 57, 72 ("Duessel Dep. III").) Duessel signed the IFSP. She acknowledged that she had no problems with the IFSP at the time and that it accurately reflected her priorities for PP. PP started at the Children's School for Early Development in approximately early November 1993. On March 2, 1994, PP "aged out" of the Westchester County EIP. PP received no ABA therapy in the EIP. (8/5/00 DiPersio Decl. at Exh. 21 at 63–65 ("Coiro Dep."); Duessel Dep. III 56, 87–92.)

Duessel stated that she did not learn about ABA therapy until "late 1994 and/or early 1995," from reading a newspaper article, and that "at around this same time, she also attended a local parents' support group where she learned that other families were engaged in disputes with the WCDOH regarding the failure of WCDOH to provide appropriate ABA therapy to their children." She testified that parents at this meeting complained of not being given appropriate. "hours" of ABA therapy. (Murphy Rep.Aff. in Supp. of Defs. Mot. for Summ.J. at Exh. 1 at 415–18.)

Duessel also testified that she became aware of the BD/MM action as a result of a hearing held by Magistrate Judge Fox (after class certification in BD was denied) to address non-party confidentiality issues. Duessel had no intention of suing until after that conference. (See id. at 385–87, 390–99.)

### 5. SS

SS was born on January 7, 1993. In 1994, he was examined by a developmental pediatrician, who diagnosed SS as having a language disorder rather than PDD. His evaluators recommended SS to EIP as a candidate for speech therapy. (Duessel Dep III at 264; Coiro Dep. II at 17.)

The initial February 28, 1995 IFSP recommended thirty to forty-five minutes of speech therapy three times a week depending on how well SS tolerated it. Services began March 6, 1995. SS also enrolled in the PARC Preschool Program. His IFSP provided for five one hundred fifty-minute sessions of center-based ABA therapy per week. A July 17, 1995 change shows a decision to provide three 30–45 minute sessions of home-based ABA per week. (Granahan Aff. at Exh. 9 ("SS IFSP").)

SS was eligible to transition to the Lakeland School District in early 1996 but his mother chose to keep him in the Westchester County Early Intervention Unit until fall of that year. (Duessel Dep. III at 296–97.) SS's January 23, 1996 IFSP provided for five 2.5 hour sessions of center-based special instruction, to begin February 6, 1996.[9] (SS IFSP.)

SS eventually developed more PDD-like symptoms, and was re-evaluated by the County. Duessel testified that after April 1996, she asked the County for referrals to agencies that provided ABA. Because she wasn't happy with the services SS was receiving at PARC, she stated that she asked one of PP's therapists to begin working with SS around May or June of 1996. (Duessel Dep. III at 325.) A June 4 change to the IFSP cancelled the PARC instruction and instituted home-based speech and ABA therapy. A July 10 change shows the addition of ABA therapy for three 90–minute sessions per week, effectively from July 8 through August 2, 1996. An August 2 change provided for an increase in ABA therapy to five 90–minute sessions per week. (SS IFSP.)

Duessel had SS evaluated by Dr. Miriam Donn, who recommended 50 hours of ABA therapy. (Duessel Dep. III at 338.) Duessel admitted that she asked Donn to make this recommendation to increase the chances that SS would receive ABA services when he transitioned out of the EIP program to Lakeland School District. (Id. at 341.) She stated that she gave a copy of this report to SS's coordinator, Elaine Coiro. According to Duessel, her reason for doing this was because she "tried everything available" to convey to Coiro that "Scott just needed more, more ABA hours." (Id.) Coiro's response to Duessel's request for more hours was that she had to discuss the matter with her supervisors. Duessel stated that "it was conveyed to me

that was the amount that was allowed at the time." (Id. at 333.) She also stated:

> Throughout the entire process I felt it was like negotiation and I had to keep pleading to them to keep increasing the hours to maximize, you know, the chances for [SS], so I was willing to accept whatever they were giving me.

(Id.)

SS transitioned out of the EIP in September 1996. (Id. at 296–97, 333–35.) Defendants point out that, although Duessel claims she was not happy with the amount of ABA services, she never pursued mediation or a hearing. (Id. at 323, 325, 338–41.)

### 6. EE

EE was born on March 9, 1994 and diagnosed with autism on or about March 13, 1996. (Granahan Aff. at Exh. 10 at 10–11, 15–16 ("Weintraub Dep. II").) Between the time of EE's diagnosis and Weintraub's initial conversation with WCDOH service coordinator Sue Ann Galante, Weintraub testified that she had learned about behavioral therapy. When she asked Galante about it, she said Galante responded that "she thought it was a good idea but she didn't know if she had anyone who could do that." (Id.34.) Weintraub continued:

> She also said to me at that time I can tell you right now that we don't do 40 hours, don't expect any 40 hours.... She brought it up. I didn't mention it.... I knew that we needed a lot of hours but when—I know that 40 hours had been mentioned and when she came right out and said we don't do 40 hours, you are not going to get that, don't even try, that was odd to me. I remember that pretty vividly.

(Id. at 34–35.) During one of several conversations, Galante allegedly told Weintraub that the behavioral therapy probably

---

**9.** The IFSP also provided for occupational therapy at home and center-based speech therapy.

wouldn't be for more than three times a week at forty-five minutes, but that she would try because Weintraub had requested it and Galante was a big believer in home based therapy. (8/5/00 DiPersio Decl. at Exh. 26 at 54–55 ("Weintraub Dep.").) Weintraub also testified that she explained to Galante that she wanted a speech therapist who was also familiar with behavioral therapy. Galante responded that she didn't know of many but she would try. (Id. at 55.)

Weintraub learned that EE would be receiving three 45-minute sessions of ABA therapy. She disapproved of the amount of behavioral therapy, and Galante said that amount was typical. When Weintraub asked why, Galante told her that was [the WCDOH] policy and that was what they typically did for an autism diagnosis. (Id. at 57.)

In response to Galante's comment that she would not give EE 40 hours, Weintraub said she was going to have to try to supplement the hours on her own. Galante allegedly encouraged her to do so. (Id. at 56.)

EE's April 4, 1996 IFSP provided for two 30-minute sessions of occupational therapy and three 90-minute sessions of ABA therapy, both per week. She also received two 45-minute sessions of speech and language therapy per month. At the IFSP, Weintraub again expressed "concern and dissatisfaction" with the number of hours that Galante was offering. Weintraub said Galante then "mentioned to me, I believe, that she would be doubling the amount of time she originally quoted to me" to "1.5 hours three times a week." (Id. at 76.)

Weintraub also objected to the amount of speech therapy, "because that wasn't much considering the severe problem my child had." She said Galante told her that was typical and that it was about what everybody got. Galante told her "if I wanted a speech therapist three times a week I could forget about the behavioral therapy three times a week." (Id. at 77.)

Weintraub wanted the speech therapist to have ABA experience, and Galante told her that she would at least try to provide somebody who was open to it, because the speech therapists had their own developmental approaches, an offer Weintraub "was not interested in." (Id.79.)

Weintraub also testified that special education teacher Laura Giacovas later told her that the County had a ten-hour policy, although County staff would not tell her so. (Murphy Reply Aff. at Exh. 2 at 133–36.)

Weintraub paid for a private therapist to perform services. She never sought reimbursement or pursued mediation or a hearing with the County. She testified that she thought it would be pointless to pursue a hearing because her service coordinator was so firm that nobody got forty hours and she was afraid that EE might have services taken away. (Weintraub Dep. at 34–35, 118–19, 121–22, 123–24, 288–89). She stated:

> [Galante] led me to believe that if I didn't sign the IFSP, that services could be delayed and that I would not get anywhere anyway if I tried to disagree with this. This is not what the County does. She was very clear on that to me. Made clear you could protest a minor point but that something as major as … forty hours a week—no possibility it would be considered.... Several times she said we don't do forty hours. Don't ever request it because nobody gets that. The gist was that they were responsible, she said, for providing [EE] with services but it didn't have to be the best services that were available.

(Weintraub Dep. II at 118.) Weintraub stated that Galante never mentioned mediation to her even though it was clear throughout the process that she disagreed with the County about EE's IFSP. (Id. at 288.) She testified that she felt "intimidated" and "in over [her] head," that she didn't want to "make matters worse" because she was "afraid to lose [the] thera-

pist," that she was a "desperate parent with a newly diagnosed child with autism," and that Galante "acted like she was doing me a favor." (Id. at 123.)

Weintraub complained to Patti Barnes about the services multiple times. (Weintraub Dep. at 82.) She remembers at some point the County increased services to four and then five days a week for two hours a day. (Id. at 102.) However, she claims that many of the promised hours "never materialized" because Giacovas was sick and took vacation during July or August. (Weintraub Dep. at 106–07.)

EE left the EIP in August 1996 when her family moved out of the area. Weintraub learned about the BD/MM litigation is May 1999 after hearing Mayerson speak at a conference. She decided to sue as a result of an internet query made by Mayerson several months later. (Murphy Rep. Aff at Exh. 2 at 353–55.)

*The County's alleged "policy" regarding ABA theraphy*

Plaintiffs argue that in addition to the their own personal situations, there is additional evidence that County had a policy of strictly limiting the number of hours of ABA allowed any one child. Defendants maintain that this same evidence shows the so-called "policy" was only a guideline that could be increased or decreased depending on the circumstances of the child.

EIP administrators and service providers were aware of ABA at the time the EIP began. They had copies of Lovaas study in their files, as well as other information about ABA therapy. (8/5/00 DiPersio Decl. at Exh. 15 at 94–96 ("Kaplan Dep."); Exh. 16 at 28–30 ("Kaufman Dep."); Exh. 17 at 33–35 ("Graubard Dep.").) The County was providing ABA therapy to children in the EIP as early as 1993. (Kaplan Dep. at 62, 92; Graubard Dep. at 65; Galante Dep. at 66.)

In March 1994, Kaplan sent a memo to New York State's Early Intervention Program that read in pertinent part:

An increasing number of parents in Westchester and other southern New York counties are following the behavioral model of Dr. O. Ivar Lovaas.... (we are continuing to investigate the validity of the claim that 40 hours per week of therapy are required to achieve success).... While we are not advocating Dr. Lovaas's program we do feel there is merit in the model using intensive behavior modification on a 1:1 basis in the home for autistic type children. We have begun in Westchester providing the intensive 1:1 model using a teaching assistant for approximately $15 per hour for two hours a day. We are therefore requesting the service taxonomy and pricing be expanded to include the above ... model[ ]. You may wish to limit the number of units per day.

(9/21/00 DiPersio Decl. at Exh. 21.) Kaplan testified at her deposition that the decision to provide two hours per day (or ten hours per week) of ABA therapy was made on the basis of the way services were provided under the Family Court procedure, the predecessor to the Early Intervention Program, in part because it was a "new therapy... people didn't know how to commence services, on what basis," and WCDOH was familiar with Family Court.[10] (Kaplan Dep. at 93, 103.)

Defendants claim that in addition to the Family Court procedures (the EIP predecessor), they relied on articles culled by the WCDOH staff, including research that indicated that children could "shut down" if over-stimulated, and that they sought guidance from several sources, include the NYSDOH and various providers of services for children suffering from autism or PDD. Kaplan and another WCDOH staff member, Merlyn Bovard, allegedly met

---

10. The Family Court procedure did not provide individualized services to children. (Chun Dep. at 20.) ("My understanding is that [the Family Court model] was a program model for all interventions five days a week, and those were the hours, two and half hours a day, regardless of the child's needs.")

with Dr. C.C. McMarin at Albert Einstein College of Medicine, who told them that, in New York City, 10 hours of ABA was used as a "benchmark" in treating autistic/PDD children. (Granahan Aff. at Exh. 37 at 35, 36, 41 ("Yang–Lewis Dep. III"); Id. at Exh. 29 at 85, 86. ("Strawder Dep."); Kaplan Dep. at 93–94, 104.)

On June 26, 1996, in connection with a request for ABA therapy made by plaintiff Mayerson on behalf of MM, Kaplan authored a memorandum to Westchester County Senior Deputy County Attorney Lee Elliot, in which Kaplan stated:

> Received phone call from Gary Mayerson. He was upset with plan. Has read research which supports 40 hours of ABA, and this was not acceptable. He is 4 litigator and will take this as far as he needs to fight for more hours, at least 20 hours. He is aware of other court cases where all the parents have won." Under "ISSUES/CONCERNS:" (Kaplan listed "2") Currently we have been following a policy which limits E.I. ABA services to ten hours a week."

(8/5/00 DiPersio Decl. at Exh. 5.) The memo was copied to Patsy Yang Lewis, Deputy Commissioner., and Veronica Strawder, Program Coordinator.[11]

When asked about this memo in her deposition, Kaplan said the county had no such policy, that it was a guideline, and that "policy" was a poorly chosen word. (Kaplan Dep. at 69.) She stated she was not aware some parents had been told that ten hours was a maximum, and that if they were, it was a miscommunication. (Id. at 86.) When asked about the reasons for the guideline, Kaplan claimed that because it was a new therapy, the County did not have any basis from which to begin providing services, so they sought assistance

from other quarters. (Id. at 94.) Kaplan also testified that none of her superiors at the DOH directed her to limit ABA therapy. (Id. at 111.)

WCDOH staff offer conflicting testimony about whether or not they believed the 10–hour number to be a limitation, and about the circumstances under which the information was communicated to them.

Patsy Yang–Lewis, who was at the time Second Deputy Director of Health and who was copied on the Kaplan memo, does not recall seeing the memo at the time it was written. (Murphy Aff. at Exh. 4 at 30 ("Yang–Lewis Dep. II.").) She testified that sometime prior to June of 1996, perhaps early 1996,

> Susanne [Kaplan] advised me that she was aware of a new approach, ABA, and that there were no guidelines or any other guidelines from the state as to what levels of service, frequency, intensity were recommended. And what she was proposing, based on Family Court center-based, was where a child came in without services, ... you know, was coming in sort of de novo and that as a starting point that ten hours would be a reasonable starting point as an average.

(9/21/00 DiPersio Decl. at Exh. 15 at 35 ("Yang–Lewis Dep.").) Yang–Lewis testified that the terms "limits" and "policy" in the memo were not an accurate depiction of the WCDOH's approach to ABA therapy, but rather a poor choice of words. (Yang–Lewis Dep. III at 53.) She stated that the "policy" memo from Kaplan did not accurately reflect the substance of her conversations with Kaplan on the subject. (Yang–Lewis Dep. at 34.)

Shortly before her meeting with Jane Doe, Graubard remembers a meeting

---

**11.** Plaintiff Mayerson discovered this memo in connection with his administrative hearing in October 1996, and he asked Kaplan about the memo when she testifies at this proceeding. Following the hearing, Mayerson filed a system complaint with NYSDOH, asking the Department to investigate whether WCDOH was secretly implementing a ten hour limita-

tion on behavioral therapy in the Early Intervention Program. The State issued a report on January 23, 1997, which found no evidence of a written policy at WCDOH, and directed WCDOH to assure NYSDOH that it was not following such a policy. (See Class Action Compl. at 72–76.)

where Bovard communicated the ten-hour guideline to the staff. (Graubard Dep. at 73–78.) When asked whether there was a policy limiting ABA to ten hours, she stated:

I apparently in the tape said that it was ten hours based on the law. I knew the law then and I know the law now, and that is a misstatement on my part. If I said that it was a ten-hour policy, yes, there was one.

(Id. at 73.) However, Graubard said she understood that the term "policy" was to be used in a much looser way than in the law:

We had been trying so hard to try to give guidelines to service coordinators to know what kinds of services were appropriate. Again we were intimidated by the fact that these children were so young, but the service coordinators didn't need to walk into these meetings cold. They needed some kind of guidance. So we said let's look at ten hours with the intent of providing what that child could tolerate.

(Id. at 73–75.) She believed the tape of her conversation showed she would be willing to increase DD's hours if needed. (Id. at 73–74.)

Galante was aware of discussions surrounding ten hours of service via ABA "at some point in time." (Galante Dep. at 70.) As to whether she was aware of a policy limiting the number of hours, she stated that, "I wouldn't use the word policy at this point. I would use the word—well, I don't know what word I would use, but I would say ten hours was, in my mind, considered to be a starting point." (Galante Dep. II at 38.) After Bovard made the statement at the staff meeting, Galante recalls that she probably would not have offered more than 10 hours without checking with someone else first. (Galante Dep. at 84–85.) Galante was involved in preparing the Kaplan memo. (Id. at 87–88.)

Bovard testified that it was Kaplan who responded to an inquiry at a staff meeting about the number of hours the service providers should offer, by saying "something to the effect that based on what New York City is doing we would like to use ten hours as a beginning point." (8/5/00 DiPersio Decl. at Exh. 23 at 31–32.) Bovard claims she did not believe the number was a policy, only a guideline. She considered ten hours a "reasonable place to start" given that the program was at its earliest stages. (Granahan Aff. at Exh. 3 at 25–26.)

Coiro testified that the 10 hours was a starting point. (Coiro Dep. at 31–32.) When asked if it was a limitation, she stated:

I wouldn't say limitation, but I would say that it was used as a place to start. I keep saying that as a starting place. Was it a limitation? I don't ever remember it feeling like a limitation, but I definitely remember the sense that it was a good place to start. . . .

(Id. at 39.)

Veronica Strawder stated that her understanding "was that it was more or less a guideline and that depending upon the parents' needs, whatever, that it could possibly be changed. I didn't see it as the quote/unquote limit. . . . [W]e have always had a kind of, particularly with the IFSP, fluid kind of process where changes can be made." (Strawder Dep. at 58.) She believed that to the extent a parent requested more than ten hours, that the county would provide it. (Id. at 76.) She stated:

From my perspective, it was a way to get a child into the system . . . [T]he providers . . . can assess how the child is doing, whether the child needs more service, whether the child can tolerate more service, and we have a whole system of making changes to increase, decrease or change service based upon how the child is doing. . . . They can say a kid isn't tolerating. They can say the kid needs more service. That is how I have always looked at it.

(Id. at 75–76.)

Defendants also argue that at the time some children in the EIP were receiving at

least 20–25 hours of home-based ABA services. However, they fail to provide a scintilla of evidence to support this assertion. First, defendants point to an April 28, 1994 letter from WCDOH staff member Veronica Strawder to Mary Ellen Herzog, a coordinator at EIP provider Stepping Stones at Union Child Day Care. In the letter, Strawder sets out compensation rates for the provision of behaviorally trained teaching assistants for "children in the CPSE process and those early intervention children whose services were arranged prior to April 18, 1994." (Granahan Aff. at Exh. 32.) However, there is no clear indication that the letter refers to home-based, Lovaas style ABA therapy. More importantly, this letter does not identify particular children who were actually receiving more than ten hours of ABA therapy, much less more than twenty. It merely states that, if Stepping Stones is providing services at those levels, the program will be reimbursed.

Defendants also cite deposition testimony from WCDOH staff that other children were receiving more than ten hours. (See Kaplan Dep. at 72 ("I would think some less and some more."); (Galante Dep. III at 45, 46; 8/5/00 DiPersio Decl. at Ex 18 at 82–83.) ("One case of 20 to 25 hours … that particular child had a diagnosis of 'fragile X.'"); Bovard Dep. at 86 (stating that prior to June 1996 there were approximately ten children receiving more than ten hours, but also stating she was unable to recall the range of hours those children received of home-based ABA therapy); 9/21/00 DiPersio Decl. at Exh. 18 at 21–22 ("E. Kaufman Dep."); Granahan Aff. at Exh. 36 at 52, 53 ("Chun Dep.").) A plain reading of this testimony reveals, however, that these witnesses merely assume that some children must have received more than ten hours. Even if they claim direct knowledge that children received more hours, they cannot identify any. Defendants offer no additional evidence outside of this testimony that any children received more than ten hours.

Finally, defendants point out that WCDOH used other intervention therapies for autistic children that were available during the time period at issue in this suit. (Kaplan Dep. at 62; Galante Dep. III at 11; Coiro Dep. at 21) WCDOH staff testified that they were aware of many treatments that were available for autism/PDD other than ABA therapy, some of which claimed success. (Graubard Dep. at 33, 34, 57–59; Galante Dep. III at 73–74; Coiro Dep. at 24, 25, 43, 44; Bovard Dep. at 68).

*The Individual Defendants*

Kaplan directed the Westchester County EIP. The nature of her involvement is alleged in the facts recited above. Defendants dispute that she sanctioned or advocated any policy limiting the number of hours of ABA. Kaplan testified that no official from WCDOH ever told her to institute such a policy. (Kaplan Dep. II at 111.)

Patsy–Yang Lewis was Second Deputy Director of Health for the relevant period. (Yang–Lewis Dep. II at 16). As the Early Intervention Official, she had overall responsibility for ensuring that the Early Intervention program in Westchester was administered in a way that complied with federal and state laws and regulations. (Id. at 19.) Yang–Lewis testified that, as Deputy Commissioner, she did not participate in the IFSP development; she reviewed the County's procedures for IFSP's before they became final. (Id. at 24.)

Yang–Lewis was copied on the Kaplan memorandum describing the ten-hour policy. (DiPersio Decl. at Exh. 5.) Although she testified in her deposition that she does not recall receiving it at the time it was prepared, Yang–Lewis stated she was aware of the ten hour policy at or around the time it was developed as a result of discussions she had with Kaplan in early 1996. (Yang–Lewis Dep. at 35–36, 42–43.) She claims that her response to Kaplan's mention of the ten-hour policy was that:

[A]s long as it was a guideline and still was individualized to that family, which meant that a child could start with more hours or less hours, but was it a reasonable hovering point, I guess a mode, it was as good a number as any, given the absence of any other recommendation that was available.

(Id. at 36). Her understanding, from her discussions with Kaplan, was that to the extent a child's situation demanded more than ten hours of home-based ABA therapy that the county would provide it. (Id. at 38). She claims to have interpreted the ten hour guideline as "neither a minimum, not a maximum, nor a set average," but as "a good place to start." Yang Lewis' gave her approval to Kaplan's proposal, and understood that Kaplan would communicate it to the Early Intervention staff. (Id. at 44).

Yang–Lewis also testified that Kaplan had heard of a staff member telling a parent that ten hours was the maximum, she would have "expected her to clarify and correct the staff's understanding, not necessarily to tell me." (Id. at 65.) She agreed that an arbitrary limit would not be in conformance with IDEA.

After Yang–Lewis became aware of the MM hearing and spoke with Kaplan about it, she and Kaplan discussed the provision of ABA therapy in the course of their monthly supervisory meetings. These discussions focused generally on whether there was any more research, or whether the state had come out with any guidelines. (Id. at 67–68.) In October 1996, after Mayerson filed his systems complaint against the county, Yang–Lewis did not conduct any independent investigation or inquiry. She testified that "the state was coming in to review our system.... we would not have come to a separate conclusion. Our role at that point was to open our files." (Id. at 82). She specifically inquired of Kaplan as to whether there was any policy, official or unofficial, and Kaplan assured her that there was not. (Yang–Lewis Dep. at 83–84.)

Mark Rapoport was Westchester Commissioner of Health from 1990 to fall of 1996. (Murphy Aff. at Exh. 3 at 7 ("Rapoport, Dep.").) As Commissioner he had general oversight responsibilities for the Early Intervention Program. "If there was a difficult problem, they would just let me know about it, so if it became a public issue or there were particularly difficult aspects to it, I would be apprised of it." (Id. at 16.)

Rapoport identified Yang–Lewis and Kaplan as the individuals responsible for implementing the Westchester EIP. He stated that "Kaplan was the most closely linked to the program. She worked full time on it." (Id. at 18.) While official policies were predetermined at the state level, Kaplan and Yang–Lewis were responsible for implementing those policies. (Id. at 55.)

Rapoport remembers one conversation with Kaplan in the hallway in which the two discussed the Lovaas therapy, although he does not recall the date of the conversation. (Id. at 18–19.) He recalls "[t]hat it was an issue that she was struggling with and didn't know how it was going to actually work out." (Id. at 19.) Rapoport testified that "there was a request for a very large number of hours of therapy that was pretty new and only shown to be effective in just one study," although he does not know the source of the request or whether it was a particular parent who made it. (Id. at 19.)

In response to a question as to whether he was aware, during his time as Commissioner, that parents in the County were dissatisfied with the number of hours of therapy that they were provided, Rapoport replied, "I know that there were some objections.... It is hard to remember just what I was aware of, but that the number of hours requested was very high and the number that we wanted to approve or did approve was less than that." (Id. at 44.) He does not recall when he learned of these objections, or the circumstances un-

der which he learned about them. (Id. at 47.)

According to Rapoport, her does not recall ever seeing or hearing of a policy limiting the hours of ABA therapy, nor did he ever become aware that any service coordinator or EIOD in the EIP believed there was a ten hour limit on Lovaas therapy. (Id. at 54.)

Harold Adel became acting Westchester County Commissioner of Health in October 1996, (Murphy Aff. at Exh. 2 at 6), and became Commissioner on January 31, 1997. Prior to his appointment as acting Commissioner, he was Deputy Commissioner for Community Health Services, a role in which he held no responsibility for provision of services to children suffering from autism/PDD. (Id. at 7.)

Adel testified that, prior to Mayerson's administrative hearing and system complaint, he was not aware of any parents in the County who were dissatisfied with the number of hours of home-based ABA therapy the County was offering. (Id. at 11–12.) Nor was he aware of any policy of limiting those hours. (Id. at 12.)

As Acting Commissioner and as Commissioner, Adel was responsible for ensuring that the Early Intervention Program was operating properly and rendered appropriate service. (Id. at 14.) After he learned of Mayerson's actions, he satisfied himself that this was the case by speaking with Patsy Yang–Lewis on a number of occasions, during which Yang–Lewis assured him that the County did not have a policy of limiting the number of hours of ABA therapy. (Id. at 18–19.) He became aware of the Kaplan memo in connection with Mayerson's actions. He sought assurances from Yang–Lewis that the 10–hour number was a guideline and not an official policy. (Id. at 25–26, 33.) Adel stated that he told Yang–Lewis he would disapprove of such a policy. (Id. at 33.) He explained his reason for this:

[B]y the time I became Commissioner [in 1997] the role of ABA appeared to be much more solid and substantial, and more was known about it. And, that it was at the time that the memo—that I was told about it was written, there was a substantial question about the validity of the service. And it wasn't clear to anyone how positive or beneficial or valid it was, or if it was likely to be of benefit. So when I became the Commissioner I assured myself that there had been no absolute limit, and I indicated that services were to be provided as they appeared to be necessary. I reiterated that there was no policy limitation. (Id. at 33–34.)

## CONCLUSIONS OF LAW

### 1. *Summary Judgment standard*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgement, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### 2. *Statute of limitations*

The applicable statute of limitations for Section 1983 claims arising in

New York is the state's three year limitation period for personal injury actions. *Hili v. Sciarotta,* 955 F.Supp. 177, 181 (E.D.N.Y.1997), aff'd, 140 F.3d 210 (2d Cir. 1998). Claims arising under Section 504 of the Rehabilitation Act are subject to the same three-year limitations period. *Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1037 (2d Cir.1993). When either of these claims accrues is determined by federal law, and in the Second Circuit, a cause of action accrues "when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Hili,* 955 F.Supp. at 181, quoting *Woods v. Candela,* 825 F.Supp. 43, 45 (S.D.N.Y.1993).

All of plaintiffs' claims, including those claims for relief that would normally be available under IDEA, are governed by this statute of limitations period. Defendants argue that a four-month statute of limitations, which the Second Circuit has applied to actions for reimbursement under IDEA, should govern. *See Adler v. Educ. Dept. of the State of New York,* 760 F.2d 454, 456 (2d Cir.1985). However, *Adler* does not apply where plaintiffs are not appealing the findings of an administrative hearing or subsequent reviews of that hearing. *See Heldman v. Sobol,* 962 F.2d 148, 158 n. 10 (2d Cir.1992) (noting that the four-month statute of limitations would apply if plaintiffs complaint "constituted an appeal from the Commissioner's decision" and citing *Adler* ); *Brooklyn Sch. for Special Children v. Crew,* No. 96 Civ. 5014, 1997 WL 539775 (Aug. 28, 1997 S.D.N.Y.); *Robert D. v. Sobel,* 688 F.Supp. 861, 864 (S.D.N.Y.1988) (applying three-year statute of limitations to action for attorney's fees under IDEA); *Mason v. Schenectady City Sch. Dist.,* 879 F.Supp. 215, 220 (N.D.N.Y.1993) (holding that four-month statute of limitations period applied in *Adler* did not bar a suit attacking the alleged failure of the defendant to advise the disabled child and his mother of their due process rights and the consequent denial of the procedural safeguards provided by IDEA).

a. The Statute of Limitations Does Not Bar Plaintiffs Claims for Declaratory Relief Under 42 U.S.C. § 1983

■ When an actionable claim under § 1983 against a county or municipality depends on a harm stemming from a county's policy or custom, "a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom.'" *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citation omitted).

■ Plaintiffs clearly were aware that they were having difficulty obtaining enough hours of ABA therapy well before these actions were filed. However, under *Pinaud,* all plaintiffs' claims for declaratory relief accrued on October 4, 1996, the day Mayerson "exposed" the Kaplan memo at MM's administrative hearing. Although it is not clear that plaintiffs EE, PP, SS and Duessel knew about the County's alleged policy on that date, plaintiffs state in their motion papers that they are willing to use this date as the starting point for the limitations period. (See Pls.' Mem in Opp. To Defs.' Mot. for Summ.J. at 16)

■ Plaintiffs EE, PP, SS and their parents filed on October 18, 1999. Thus, the *EE* and *PP* actions appear on their face to be untimely. The only way they can be prosecuted is if the statute of limitations was tolled for at least two weeks during the three years following the accrual date.

■ The filing of a class action tolls the applicable statute of limitations, and thus permits all members of the putative class to file subsequent individual actions, provided that the actions are filed within the remaining time. *See Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 553–54, 94 S.Ct. 756,

766, 38 L.Ed.2d 713 (1974). This rule is consistent with the purpose of a class action, namely, to allow members to rely on the representative plaintiffs to prosecute the claims of the class. *See id.* at 353, 103 S.Ct. 2392.

The *BD* plaintiffs filed their class action complaint on February 6, 1998. On January 15, 1999, I denied the motion for class certification. The *BD* complaint, which alleged violations of Section 1983 and the Rehabilitation Act of the basis of the County Defendants' alleged illegal policy, is similar in all material respects to the *EE* (EE and Weintraub) and *PP* (PP, SS, and Duessel) complaints. The putative class was defined as all children in the State of New York "who are diagnosed with autism or PDD and their parents and/or guardians, and who applied for and/or received early intervention services at any time between July 1, 1993 and the date of class certification." (Pl. Stmt at ¶ 122). EE, PP, SS and their parents were thus putative members of the BD class. Under *Crown, Cork & Seal,* it would appear that the limitations period was tolled for almost eleven months.

Defendants argue that the tolling rule nevertheless should not apply to the *EE* and *PP* plaintiffs. They point out that, while the *Crown, Cork & Seal* rule is broad, it is not without limits. For example, in *Wahad v. City of New York,* No. 75 Civ. 6203, 1999 WL 608772 at *1 (S.D.N.Y. 1999), the court found that the statute of limitations for plaintiff's action was not tolled, despite plaintiff's putative membership in a pending class action. The class action was filed in May 1971, and class certification was granted in May 1979. *Id.* at *5. Wahad, however, did not rely on the

class action to protect his rights, but filed his own action on December 1, 1975, instead of waiting for class certification. Thus, the district court declined to apply the usual tolling rule, explaining that notions of reliance and efficiency were critical to the *Crown, Cork & Seal* decision. *Id.* at *5–6.[12]

The facts of *Wahad* are distinguishable from those at bar. Unlike Weintraub and Duessel, Wahad filed his own suit prior to any decision on the motion for class certification. It is true that Weintraub and Duessel did not "rely" on the pendency class action in the strict sense.[13] However, *Wahad* does not support the contention that every putative member of every class action whose case is tolled by the rule in *Crown, Cork & Seal* must necessarily be aware of the pending class action to take advantage of the *Crown, Cork & Seal* tolling rule. I thus decline to rely on *Wahad* to support a conclusion that the *EE* and *PP* plaintiffs' claims for declaratory relief are time barred.

b. There Remain Disputed Issues of Fact as to Whether The Statute of Limitations Bars EE and SS's Claims for Reimbursement

EE (Weintraub) and SS (Duessel) seek reimbursement for providing privately-funded ABA hours. There are disputed issues of fact as to when these two plaintiffs were aware that they were entitled to contest the County's decision not to offer additional hours of ABA and to request that the County reimburse plaintiffs for their expenses. Defendants' motion to dismiss these claims on statute of limitations grounds is denied.

**12.** In fact, the court noted that after filing, plaintiff objected to the settlement of the class action because he feared that it would adversely impact his own action. *Id.*

**13.** Duessel testified that she learned of the BD/MM action as a result of a hearing held by Magistrate Judge Fox (after class certification was denied) to address non-party confidentiality issues (Murphy. Rep. Aff at Exh. 1 at

385–87, 390–99; Exh. 3). She had no intention of suing until after that conference. (Id.) Weintraub learned about the litigation in May 1999, after class certification was denied, as a result of hearing Mayerson speak at a conference. She only decided to sue as a result of an Internet query made by Mayerson several months later. (Id. at Exh. 2 at 353–55).

c. There Remain Dispute Issues of Fact Whether The Statute of Limitations Bars Plaintiffs' Claims for Damages Under § 1983 and the Rehabilitation Act

Plaintiffs also claim damages for such things as emotional distress, and long-term effects on plaintiff children, as well as punitive damages. Plaintiffs' claims for damages did not necessarily accrue when they learned of the County's alleged "policy," or when they aged out of the system. However, when plaintiffs knew or could have known that they were aggrieved parties presents an issue of fact, *see Barrett v. United States,* 689 F.2d 324, 333 (2d Cir. 1982); *D'Angelo v. City of New York,* 929 F.Supp. 129, 132 (S.D.N.Y.1996), and there remain disputed issues of material fact with respect to when the damages claims of EE, Weintraub, PP, SS and Duessel accrued. Accordingly, defendants' motion for summary judgment on these claims is denied.

3. *Exhaustion of Administrative Remedies*

Plaintiffs who bring suit under IDEA must first exhaust the administrative remedies available to them under the statute. A party who disagrees with his child's IFSP or other decisions made regarding services for their child must request an impartial due process hearing before the state or local educational agency. *See* 20 U.S.C. §§ 1415(f), (*l*). For children in New York's EIP, this means a parent or guardian must initially seek review of her child's placement through an impartial due process hearing conducted before an administrative law judge. *See* N.Y.Pub. Health Law § 2549. Only after the administrative procedures are exhausted may an aggrieved parent seek court review of the adequacy of the IFSP. *See Riley v. Ambach,* 668 F.2d 635, 640 (2d Cir.1981); *Heldman v. Sobol,* 962 F.2d 148, 158 (2d Cir.1992); *Mrs. W. v. Tirozzi,* 832 F.2d 748 (2d Cir.1987); *Hope v. Cortines,* 69 F.3d 687 (2d Cir.1995). The "failure to exhaust

deprives a district court of subject matter jurisdiction over the [action]." *Engwiller v. Pine Plains Central School District,* 110 F.Supp.2d 236, 245 (S.D.N.Y.2000)

A plaintiff who files suit under Section 1983 or the Rehabilitation Act because of alleged violations of IDEA must still comply with the IDEA's exhaustion requirements. *See* 20 U.S.C. § 1415(*l*); *Tirozzi,* 832 F.2d at 756 (where "suit *could have been filed* under" under statutory predecessor to IDEA, parents required to exhaust IDEA remedies to same extent as if suit had been filed originally under the IDEA); *Hope v. Cortines,* 69 F.3d 687 (2d Cir.1995) (adopting district court's opinion in its entirety, including determination that Congress intended Section 1983 claims to be subject to 1415(f)'s (now 1415(*l*)'s) requirements); *Mrs. M. v. Bridgeport Bd. of Educ.* 96 F.Supp.2d 124, 129 n. 8 (D.Conn. 2000) (citing *Tirozzi,* 832 F.2d at 756).

The Second Circuit has held, however, that exhaustion is excused when: (1) it would be futile to use the due process procedures required by IDEA; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies, such as, for example, when a hearing officer lacks authority to grant the relief sought. *Tirozzi,* 832 F.2d at 756.

a. The Exhaustion Requirement and Plaintiffs' Claims for Reimbursement of Amounts Expended on Private Therapy

EE (Weintraub) and SS (Duessel) seek reimbursement for providing privately-funded ABA hours. Because this remedy is available under IDEA, plaintiffs were required to exhaust. *See Tirozzi,* 832 F.2d at 756.

Plaintiffs allege that, because the County had a secret policy, exhaustion was futile. Ordinarily, this argument would be appealing. But here it overlooks a critical

fact. Policy or not, Mayerson and Jane Doe did pursue their administrative remedies, and won. Thus, it would not be appropriate to excuse EE and SS's parents from exhausting their administrative remedies, despite the allegation of a policy. *See Schlude v. Northeast Cent. Sch. Dist.*, 892 F.Supp. 560, 566 (S.D.N.Y.1995) (where plaintiff was aware of administrative proceedings for appealing placement decisions, exhaustion would not be futile).

■ This does not mean that I can grant summary judgment to defendants on these claims. Weintraub contends that she did not need to exhaust her administrative remedies because the County failed to inform her of her right to challenge the IFSP, as they were required to do under IDEA. *See* 20 U.S.C. § 1439(a)(7); *see Mason v. Schenectady City Sch. Dist.*, 879 F.Supp. 215, 219 (N.D.N.Y.1993) (school district's persistent failure to inform plaintiff of procedural safeguards under IDEA excused failure to exhaust). Similarly, while Duessel was aware of other parents' disputes with the County over the number of hours of ABA sometime in 1994, while SS was in the EIP, it is not clear from the present record whether the County informed Duessel of her rights to challenge her child's placement. Nonetheless, these two plaintiffs' ability to recover the costs of the private therapy will depend on their proving that they were not told they could see administrative redress when they received the children's IEPs.

b. The Exhaustion Requirement and Plaintiffs' Other Damages Claims

Plaintiffs also claim damages due to the County's alleged failure to provide appropriate early intervention services to plaintiff children. These damages, which include compensation for injury to the children and emotional distress of the parents, are separate from any claim for reimbursement of funds expended to obtain private ABA therapy.

■ Because they exhausted their administrative remedies, MM, Mayerson, DD, and Jane Doe are not barred from pursuing their damages claims under § 1983 and the Rehabilitation Act.[14] However, BD, Jean Doe, EE, Weintraub, PP, SS and Duessel did not exhaust their administrative remedies under IDEA at any time. Defendants assert that those plaintiffs cannot recover money damages solely under Section 1983 and the Rehabilitation Act.[15] The plaintiffs who failed to exhaust claim that, because 1415(*l*) requires exhaustion only when the plaintiff seeks relief "that is also available under" IDEA, see *Tirozzi*, 832 F.2d at 756, and because general money damages are not available under IDEA, they were not required to exhaust their administrative remedies before proceeding with their § 1983 and Rehabilitation Act claims.

The Second Circuit has not addressed this specific question. *Tirozzi* involved a dismissal on the pleadings and the Second Circuit ruled only that the complaint alleged facts from which an exception from exhaustion might be found. *Id.* at 757. We are far beyond the pleading stage here. I must therefore try to discern how the Second Circuit would rule.

The majority of courts facing this complex issue have rejected plaintiffs' argument, holding that a plaintiff seeking money damages (other than reimbursement for services privately procured) is required to exhaust under IDEA, even if money damages are not available under IDEA or through the administrative process. *See, e.g. Charlie F. v. Board of Educ.*, 98 F.3d 989, 991–93 (7th Cir.1996); *Doe v. Alfred*, 906 F.Supp. 1092, 1098 (S.D.W.Va.1995) (noting that "a clear majority of courts

---

**14.** As will be seen, this same fact prevents me from finding that there was a violation of these plaintiffs' due process rights.

**15.** Of course, if EE, Weintraub, SS and Duessel are excused from the exhaustion requirement under the futility exception, then there is no question that they too may pursue their damages claims against the County.

hold exhaustion necessary despite the assertion of a contemporaneous § 1983 claim for damages"), appeal dismissed, 79 F.3d 1141 (4th Cir.1996); *Waterman v. Marquette–Alger Intermediate Sch. Dist.,* 739 F.Supp. 361, 364–66 (W.D.Mich.1990); *Porter v. Board of Trustees of Manhattan Beach Unified Sch. Dist.,* 123 F.Supp.2d 1187, 1199–1200 (C.D.Cal.2000) (dismissing § 1983 claims after finding that, of plaintiffs claims for money damages, declaratory and injunctive relief, and compensatory damages for private instruction, only money damages are not available under IDEA.); *Frazier v. Fairhaven Sch. Committee,* 122 F.Supp.2d 104, 2000 WL 1742512 (D.Mass.2000) (administrative exhaustion necessary even where plaintiffs seek only monetary damages under § 1983).

Under the minority approach, the pursuit of remedies not available under IDEA renders exhaustion futile. *See W.B. v. Matula,* 67 F.3d 484, 495–96 (3d Cir.1995) (holding that exhaustion is not required for plaintiffs seeking money damages, because damages are not available through the administrative process, and because all other relief available to plaintiffs available under IDEA had already been provided though a settlement agreement); *Witte v. Clark County School District,* 197 F.3d 1271 (9th Cir.1999) (noting that relief sought for plaintiff's injuries was "retrospective only" and that relief available under IDEA was not well-suited to remedying past instances of physical injury).

I agree with the courts that hold that plaintiffs should not be allowed to avoid the administrative requirements of IDEA by claiming only monetary damages or other relief not available under IDEA. To hold otherwise would be to allow the futility exception to "swallow the rule." *See Frazier,* 122 F.Supp.2d at 109. It was clearly Congress' intent to prevent an end-run around IDEA by plaintiffs who cast an IDEA claim as a § 1983 action predicated on a violation of IDEA. *See* H.R.Rep. No. 99–296, 99th Cong., 1st Sess. 4 at 7,

U.S.Code Cong. & Admin.News, p 1807 (1985) ("parents alleging violations of section 504 and ... [§ ] 1983 are required to exhaust administrative remedies before commencing separate actions in court where exhaustion would be required under [IDEA]"). Plaintiffs' claims in the instant action are directly related to the appropriateness of their placement, which is normally challenged, explored, and resolved under IDEA. Any plaintiff who failed to challenge his child's IFSP *at the time,* and who was not excused from doing so, can not now bring on an action for damages under § 1983 or the Rehabilitation Act.

With respect to BD and PP, however, there has been no such end run. On this record it is undisputed that these parents did not know about ABA therapy until after their children had aged-out of the EIP. By saying this, I do not mean to imply that any parents who are not aware of the benefits of a particular therapy or program should be allowed, years later, to bring a claim for damages. However, if I accept for the sake of this argument that the County had a secret policy and actively hid the existence of ABA therapy from BD and PP's parents, those parents should not be penalized for failing to hear about or to discover ABA while their children were still eligible for services. Congress was worried about "deliberate disregard and circumvention of agency procedures" that it had established. *Association for Retarded Citizens of Alabama v. Teague,* 830 F.2d 158, 160 (11th Cir.1987); *see also N.B. v. Alachua County Sch. Bd.,* 84 F.3d 1376, 1379 (11th Cir.1996) (citing *Teague* ); *Buffolino v. Board of Educ. of Sachem Cent. Sch. Dist.,* 729 F.Supp. 240, 247 (N.D.N.Y.1990) ("plaintiffs could not avoid administrative procedures merely by asking for relief that administrative authorities could not grant."). BD's and PP's parents made no such deliberate effort to avoid bringing suit under IDEA.

In addition, BD and PP, having aged out of the EIP by the time they learned about ABA therapy, had no way to obtain re-

dress under IDEA. They could no longer challenge their child's IFSP, and they could not seek reimbursement because they had not funded any private services for their children. In *Covington v. Knox County School System*, 205 F.3d 912 (6th Cir.2000), plaintiff's disabled son was repeatedly placed in a small, locked, concrete-floored, unventilated "time-out room," sometimes for long periods. *Id.* at 913. Plaintiff filed an administrative complaint with the Tennessee Department of Education, and asked for a due process hearing, which was repeatedly delayed in large part because of the plaintiff. *Id.* at 914. Although no due process hearing had yet taken place, plaintiff filed a federal complaint, which did not allege violations of, or even mention, IDEA. Plaintiff appealed the grant of summary judgment to defendants, in which the district court found that plaintiff was required to exhaust under IDEA, because use of the "time-out" room was a matter mentioned in plaintiff's IEP and was a matter "subject to IDEA." *Id.* at 914. Plaintiff argued that because her claim did not arise under IDEA, exhaustion was not required. The Sixth Circuit found that:

> given the unique circumstances of plaintiffs case—in which the injured child [had] already graduated from the special education school, his injuries [were] wholly in the past, and therefore money damages [were] the only remedy that [could] make him whole—proceeding through the state's administrative process would have been futile and was therefore not required.

*Id.* at 917.

Thus, I conclude that BD and PP and their parents should be allowed to proceed with their claims for monetary damages under § 1983 and the Rehabilitation Act, even though they did not pursue administrative relief. The purposes of the exhaustion doctrine are not served by requiring barring these two plaintiffs from bringing their damages claims under § 1983. "The exhaustion doctrine prevents courts from

undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes." *Heldman v. Sobol*, 962 F.2d 148, 159 (2d Cir.1992) "In determining whether exceptions to the exhaustion requirement are met in a particular case, a court should examine whether pursuit of administrative remedies under the facts presented in the case will further the general purposes of exhaustion and congressional intent behind the administrative scheme." *Mrs. M v. Bridgeport Bd. of Educ.*, 96 F.Supp.2d at 130. It was Congress' intent to prevent plaintiffs from intentionally avoiding IDEA's requirements by waiting to file suits for damages under § 1983 and other statutes. There is no evidence that Doe or Duessel had any awareness of ABA therapy while their children were enrolled in the EIP.

I again note that EE (Weintraub) and SS (Duessel) will be allowed to pursue their claims for damages if and only if they can prove that they were not informed of their right to pursue administrative relief while they were enrolled in the EIP. I cannot make this determination on the present record.

c. The Exhaustion Requirement and Plaintiffs' Claims for Declaratory Relief

■ All plaintiffs are requesting declaratory relief under § 1983 in the form of a finding that defendants pursued a general policy of limiting ABA hours, in violation of IDEA. This is precisely the type of relief that is not available to plaintiffs under IDEA. They could not have exhausted this claim in a proceeding in front of an ALJ. Thus, plaintiffs' claims for declaratory relief are not barred for failure to exhaust.

4. *Plaintiffs' claims for declaratory relief are not moot*

■ Plaintiffs originally sought injunctive and declaratory relief under Section 1983 against all defendants. On January

15, 1999, I denied plaintiffs' motion for Rule 23(b)(2) class certification in this case. In doing so, I found that the named plaintiffs, and MM in the *MM* action, had all aged out of the early intervention program (the program that allegedly relied on the inappropriate policy) prior to the time the lawsuit was commenced. This would have prevented the fashioning of any appropriate injunctive relief by this court, because there was no way to do so without interfering with the children's current educational plan under IDEA. Thus plaintiffs claims for injunctive relief were moot. (Jan. 15, 1999 Hrg.Tr. at 27.)

■ Plaintiffs still seek a declaration that the County Defendants maintained an illegal custom, practice or policy in the EIP from 1993–96.[16] They argue that a party's claim for declaratory relief may be viable even when that party's request for an injunction is moot. As a general matter plaintiffs are correct. *See Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (under Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, a federal court may grant declaratory relief even when an injunction is not available); *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (holding that plaintiff's failure to obtain injunctive relief does not preclude declaratory relief). Because they are asking for retrospective declaratory relief addressing the County Defendants' past conduct, plaintiffs contend that such relief is permissible. *See Community Health Care Assoc. of New York v. DeParle,* 69 F.Supp.2d 463, 473–74 (S.D.N.Y.1999) (denying motion to dismiss claim for retrospective declaratory relief against Westchester County official).

However, as the Supreme Court has noted, "the declaratory judgment statute is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Mansour,* 474 U.S. at 72, 106 S.Ct. 423. "The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is 'informed by the teachings and experience concerning the functions and extent of federal judicial power.'" *Community Health Care,* 69 F.Supp.2d at 471(quoting *Mansour,* 474 U.S. at 72, 106 S.Ct. 423).

■ The two criteria guiding the policy in favor of rendering declaratory judgments are (1) whether the judgment will serve a useful purpose in clarifying and settling legal relations in issue, and (2) whether it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding. *See Continental Casualty Co. v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir. 1992). If either prong of the test is met, the request for declaratory judgment should be entertained. *See id.*

With respect to whether the County pursued an unlawful policy, this case is indistinguishable from *Community Health Care.* There, plaintiffs sued Westchester County, New York State and Federal Government officials, alleging that defendants were responsible for policy decisions that led to violations of a Medicaid law that was in effect from 1990 until October 1, 1997. The relief requested was a declaratory judgment. *Id.* at 468–70. While the requested relief with regard to the *state* officials' past violations was dismissed on Eleventh Amendment immunity grounds, Judge Parker found that plaintiffs had sufficiently alleged a Section 1983 cause of action against the *county* official, who was sued in his official capacity *Id.* at 473. Defendants' request to strike plaintiffs claim for declaratory relief is therefore denied.

### 5. *§ 1983 Claims*

To prevail on their Section 1983 claim, plaintiffs must establish that they were

---

**16.** To the extent that the complaints refer to a continuing illegal policy or current unlawful conduct by the County Defendants, those contentions are supplanted by the Pretrial Order which makes it clear that Plaintiffs are seeking redress for conduct by the County Defendants during the period 1993–1996 only (Pretrial Order at 5, 30).

deprived of a right secured by the Constitution or laws of the United States without due process of law, and that the alleged deprivation was committed under color of state law. *See, e.g., American Manufacturers Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999); *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994).

 Defendants argue that plaintiffs' Section 1983 claims should be dismissed because: (1) plaintiffs have failed to establish that they have a protected property interest in the right to ABA therapy; and (2) plaintiffs had an opportunity to be heard through IDEA's administrative procedures and thus were not denied due process. *See Mathews v. Eldrige,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs move for summary judgment on the merits of the Section 1983 claim.

a. Plaintiffs Have a Protected Property Right in their IFSP's

 A constitutionally-protected life, liberty or property interest which has been denied without due process violates the Fifth and Fourteenth Amendments of the U.S. Constitution. *Muller Tours Inc. v. Vanderhoef,* 13 F.Supp.2d 501, 506 (S.D.N.Y.1998). A plaintiff has a property interest in a benefit if he has a "legitimate claim of clear entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Whether a plaintiff has a "clear entitlement" to a benefit is determined primarily by examining the degree of discretion afforded to the entity dispensing the benefit. *Muller Tours,* 13 F.Supp.2d at 506.

Defendants contend that plaintiffs are asserting an entitlement to a specific methodology or type of services under the IDEA. Defendants incorrectly construe the property interest at issue in this case.

Here, plaintiffs had a protected property right to an individualized treatment plan which would meet their needs. *See Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141, 148 (2d Cir.1983) (denial of "free appropriate education" constitutes deprivation of property right). As children diagnosed with autism/PDD, plaintiff children were eligible for individualized early intervention services. Both IDEA and the state law implementing the statute contain mandatory language rendering such early intervention services an entitlement. The IDEA and New York law require that an IFSP based on the specific needs of each child. *See* N.Y.Pub. Health Law §§ 2544, 2545; *see also Brooklyn School for Special Children v. Crew,* No. CIV.A 96 5014 LAP, 1997 WL 539775, at *1 (S.D.N.Y. Aug. 28, 1997) (upholding § 1983 claims based on city and state's failure to reimburse schools for early intervention services provided under IDEA); *W.B. v. Matula,* 67 F.3d at 493–94 (§ 1983 action brought to enforce IDEA)

I decline to accept defendants' characterization of the right involved here as a "right" to ABA therapy. If defendants, because of the existence of a secret policy, did not provide plaintiff children with individualized education plans in disregard of each child's individual needs, plaintiffs were deprived of a protected property right. One way defendants may have done this is by arbitrarily limiting the number of hours they would agree to provide any particular child in the EIP, without regard to that child's needs.

b. Due Process

Due process requires that the government provide the procedural protections of notice and a hearing before there is a deprivation of a protected right or interest. *See Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Procedural due process claims are evaluated under a balancing test that weighs the strength of the private interest together with the procedures necessary to protect the interest against the pertinent state interests. *Mathews v. Eldridge,* 424 U.S.

319, 333, 96 S.Ct. 893 (1976). A procedural due process violation is established if plaintiff shows that he or she was deprived of a meaningful opportunity to be heard with respect to the claim in issue. *Id.*

Defendants argue that plaintiffs have failed to articulate how they were deprived of their property interest without due process of law. Defendants claim that those plaintiffs who received an administrative hearing or mediation were not deprived of due process. They point to the fact that DD and MM both challenged their IFSPs, through a hearing and mediation, respectively, and each received what they requested—reimbursement for the additional ABA therapy that they had purchased privately. Defendants also argue that the plaintiffs who never availed themselves of the process cannot claim that they lacked due process, because legally sufficient process was available. Thus, defendants claim, all plaintiffs were afforded due process and the only question is whether or not they chose to take advantage of it.

Plaintiffs claim that the existence of the "secret" policy resulted in a denial of due process protections. *See Bowen v. City of New,* 476 U.S. 467, 485, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (secrecy of Social Security Administration policy precluded claimants from challenging it through the administrative process); *see also Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988) (adequate post-deprivation state law remedy necessary to avoid due process violation).

I agree with plaintiffs in theory. Indeed, I have previously rejected defendants' very argument in another IDEA case where it was clear that the state failed to comply with its responsibilities under IDEA's implementing regulations. *Engwiller v. Pine Plains Cent. Sch. Dist.,* 110 F.Supp.2d 236, 247–48 (S.D.N.Y.2000) (noting that "availability of remedies" argument "ignores the IDEA's clear mandate that state and local agencies—not parents—bear responsibility" for ensuring timely administrative hearing decisions).

However, I am again compelled by the realities of this case to examine each plaintiffs' due process claim on its own merits. Policy or no policy, the deprivation at issue in this case, as plaintiffs themselves contend, is the failure to provide each child with an individualized education program. Section 1983 liability arises if and *only* if this deprivation occurred without due process of law. If any plaintiff received adequate due process relevant to this deprivation, his claims must be dismissed.

The procedural protections available under IDEA and New York State law to parents with infant children enrolled in New York State's EIP are detailed and comprehensive. Like the elementary education provisions, they are "at the heart of the statute" and "encompass both administrative and judicial proceedings." *Quackenbush v. Johnson City School District,* 716 F.2d 141, 145 (2d Cir.1983), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1984). These protections begin when the handicapped infant enters the program, and include "[t]he right of the parents to determine whether they, their infant or toddler, or other family members will accept or decline any early intervention service under this part in accordance with State law...." The State must also provide written notice to parents when the State or service provider "proposes to initiate or change or refuses to initiate or change the identification, evaluation, or placement of the infant or toddler ... or the provision of appropriate [EIP] services." 20 U.S.C. § 1439(a)(3), (6).

This mandated collaboration and required parental approval is supplemented by additional procedural protections, namely, the state must also provide "timely resolution of complaints by parents." *Id.* at § 1439(a)(1). New York provides parents or guardians with the chance to seek review of their children's IEP through an impartial hearing conducted before an administrative law judge. *See* N.Y.Pub. Health Law § 2549. Parties to administrative hearings under IDEA:

have the rights to be advised by counsel and by individuals with special knowledge or training in the problems of handicapped children, to present evidence, to confront, cross-examine, and compel the attendance of witnesses, to a record of the hearing, and to written findings of fact and decisions. *Quackenbush,* 716 F.2d at 146. Parents of infants and toddlers with an IEP also have "the right ... to use mediation in accordance with section 1415(e)," which provides that mediation "shall be available whenever a hearing is requested" by the parent. § 1439(a)(8); 1415(e)(1), (2).

■ While the hearing process available under IDEA is a "post-deprivation" hearing, it is nevertheless adequate due process. Normally, the State must provide some kind of hearing before, rather than after, it deprives a person of liberty or property. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). There are exceptions to this rule, however, and the Second Circuit has declined "to attach talismanic significance to the availability of a pre-deprivation evidentiary hearing." *Interboro Institute v. Foley,* 985 F.2d 90, 92 (2d Cir.1993).

■ The Second Circuit has noted that "[w]hen reviewing alleged procedural due process violations, the Supreme Court has distinguished between (1) claims based on established state procedures and (2) claims based on random, unauthorized acts by state employees." *Hellenic American Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 881 (2d Cir.1996) ("HANAC") (citing *Hudson v. Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). In the former case, where plaintiffs challenge is to the very regulations or standards enacted or promulgated by the state, availability of a post-deprivation hearing is not necessarily adequate to guarantee due process. In the latter case, where officials act in violation of established law, the Due Process Clause is not violated "so long as the State provides a meaningful post-deprivation remedy." *HANAC,* 101 F.3d at 881.

The facts of *HANAC* lead me to conclude that plaintiffs' claims in the present case fall under the latter category. HANAC, a non-profit public service City contractor, alleged that it was de facto debarred from city procurements in violation of § 1983. In March 1996, the City and U.S. Attorney's Office began investigations into irregularities in the grant of a contract by the City's Human Resources Administration (HRA) to HANAC. The Mayor ordered HRA to terminate two HANAC contracts. HANAC took an administrative appeal of these decisions, but later abandoned the appeal after learning of a directive by the Mayor's office prohibiting all City agencies from taking any "procurement action of any kind" involving the plaintiff. HANAC abandoned its administrative appeal, which it considered "a useless endeavor" in light of what it regarded as the City's blanket decision to terminate HANAC's contracts. Plaintiff then commenced an Article 78 proceeding challenging only the termination of its HRA contracts. It did not claim de facto debarment nor did it raise any due process claims. Five days after filing the Article 78 proceeding, HANAC filed the Section 1983 action, during which it learned of the directive from the Mayor's office. *Id.* at 879.

The Second Circuit held that the alleged deprivation of HANAC's protected property and liberty interests (if any) occurred because of a random and arbitrary act (the *de facto* debarment), noting that plaintiff:

> makes no claim that the due process violation was caused by an established state procedure, such as City Charter or PPB Rules. To the contrary, HANAC argues that state officials acted in flagrant violation of the City Charter and

[Procurement Board] Rules.... Thus, HANAC's claims can survive only if New York does not provide adequate post-deprivation procedures. *Id.* at 881.

The Article 78 proceeding was, as in other cases, a more than adequate remedy, and thus HANAC was not denied due process of law. *Id.; see also Gudema v. Nassau County,* 163 F.3d 717, 724–25 (2d Cir.1998); *accord Giglio v. Dunn,* 732 F.2d 1133, 1134 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 265 (1984); *Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1984); (Where plaintiff "had the right to make written submissions on disputed issues of fact and law and had, following the deprivation, [Article 78 of the New York Practice Law and Rules] procedures available to compel a full-scale evidentiary hearing on its claims," those procedures satisfy due process.); *Irwin v. City of New York,* 902 F.Supp. 442, 449 (S.D.N.Y.1995) (finding that "extensive" informal process prior to deprivation and availability of Article 78 proceedings under New York state law precluded finding of a due process deprivation). Furthermore, a post-deprivation hearing can be adequate for due process purposes "even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." *HANAC,* 101 F.3d at 881.

■ Similarly, the plaintiffs in the present case accuse the County of a de facto decision to limit ABA therapy in violation of federal and state requirements. Because the State cannot remedy a violation of IDEA until it occurs, this was an instance where a post-deprivation remedy is the only one "which the State could reasonably be expected to provide." *Simmons v. Chemung County Dept. of Social Servs.,* 770 F.Supp. 795 (W.D.N.Y.1991) (citing *Parratt,* 101 S.Ct. at 1916; *Hudson,* 104 S.Ct. at 3203).

Furthermore, the IDEA administrative hearing procedures at issue here are sufficiently similar to Article 78 proceedings to fall under the ambit of *HANAC,* 101 F.3d

at 881 (Article 78 provides "both a hearing and a means of redress for petitioners"); *Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 202 (2d Cir.1996) (Article 78 petitioners can "submit ... affidavits and other written proof [of their claim], and where a triable issue of fact is raised, the petitioner may obtain a trial."); *Liotta v. Rent Guidelines Bd.,* 547 F.Supp. 800, 802 (S.D.N.Y.1982) (explaining that Article 78 "provides a mechanism for challenging a specific decisions of a state administrative agency.").

Under the above analysis, it is clear that Mayerson and MM were deprived of nothing. Mayerson challenged the County's refusal to provide more ABA hours or to pay for hours that Mayerson was himself providing. He received an impartial hearing. He even learned of the County's alleged policy during that hearing, and had an opportunity to litigate the issue in front of the ALJ. The ALJ determined that MM's EIP was insufficient and that the additional therapy paid for by Mayerson was appropriate. He ordered the County to reimbursed Mayerson for the expense. He received, in Judge Winter's words, "all the process [he] is due." *Interboro Institute v. Foley,* 985 F.2d at 91.

The same reasoning applies to DD and Jane Doe. Plaintiff's own admissions compel me to conclude that Doe also received adequate due process. Doe admits that she requested mediation with the County because she was unhappy with the number of hours of ABA therapy being given to DD. This mediation was unsuccessful. However, she later entered a stipulation in which the County agreed to reimburse her for the entire cost of privately-funded ABA therapy. Plaintiff admits that she sought the procedural protections available-under IDEA, which allowed her to challenge the adequacy of DD's IEP. When mediation failed, she was free to pursue an administrative hearing, and there is no evidence that she was prevented from doing so by the County. The stipulation most likely

rendered a hearing unnecessary, but even if she had additional complaints with the County, she was obliged to take advantage of the procedural protections available to her under IDEA. *Giglio,* 732 F.2d at 1135 n. 1 (Where employee had "a meaningful opportunity to challenge" his resignation, "he was not deprived of due process simply because he failed to avail himself of the opportunity."); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 250 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1984).

■■■ With respect to BD, PP and their parents, I find—in direct contrast to the above plaintiffs—that they had neither notice of nor an opportunity to be heard on the deprivation of their right to an individualized IEP in accordance with state and federal law. For these plaintiffs, defendants' argument that the procedural protections were available and therefore adequate is a "formalistic understanding of meaningful notice." *Mallette v. Arlington County Employees' Supplemental Ret. Sys. II,* 91 F.3d 630, 641 (4th Cir.1996) (plaintiff deprived of minimum procedural safeguards where she "could not have understood the adverse nature of the hearing, could not have adequately evaluated her need for counsel, and could not have prepared appropriate rebuttal evidence"). One can not challenge a deprivation of which one is unaware. *See Gifford v. United States,* 23 Cl.Ct. 8 (1991) (finding discharged serviceman "was denied due process when he was not apprised of and, therefore, was unable to defend against, the ultimate basis for his dismissal."). This is especially true when the same people who are supposed to afford procedural protection are the ones concealing the deprivation. *See J.G. by Mrs. G. v. Board of Educ. of Rochester City School Dist.,* 830 F.2d 444, 447 (2d Cir.1987) ("Where plaintiffs assert the deprivations of their due process rights to proper notice and a hearing, they cannot be faulted for the lack of

an administrative hearing and appeal.") (citing *Quackenbush v. Johnson City School Dist.,* 716 F.2d at 147–48).

On the present record, I cannot decide the motion for summary judgment with respect to EE, SS and their parents. These plaintiffs received adequate due process if they were informed of their right to pursue mediation or an administrative hearing to contest the County's decision, whether or not they chose to take advantage of the procedural safeguards. *See Giglio,* 732 F.2d at 1135 n. 1; *Eastway Construction Corp.,* 762 F.2d at 250; *Oberlander,* 740 F.2d at 120. If, however, the County either did not inform these plaintiffs of their right to a hearing, or actively prevented them from pursuing an administrative hearing, then they were denied due process, and can proceed with their § 1983 claims.

c. Qualified Immunity

Qualified immunity shields public officials sued in their personal capacities from liability for damages under § 1983. "The entitlement to qualified immunity is an immunity from suit, rather than a mere defense against liability; therefore, it is effectively lost if a case is erroneously permitted to go to trial." *Neu v. Corcoran,* 869 F.2d 662, 664 (2d Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). As a result, "[t]he Supreme Court has encouraged the use of summary judgment when qualified immunity is raised as a defense." *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992). The qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■■■ Whether a defendant can enjoy qualified immunity "turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time [the action]

was undertaken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991) (citing *Harlow* ).

■ For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity:

> [T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (citations omitted). In making this determination, the Second Circuit has instructed courts to consider: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994).

Defendants argue that the rights in question are not defined with specificity. They point to a case decided earlier this year, in which a district judge observed that IDEA's definition of free appropriate education "is too nebulous for effective application by the courts" and that the "IDEA does not set forth any objective criteria to guide courts ..." *Board of Educ. v. Michael M.,* 95 F.Supp.2d 600, 606 (S.D.W.Va.2000). Defendants characterize plaintiffs claim as a demand for ABA therapy, arguing that IDEA does not compel any one methodology or clearly establish a right to ABA therapy. *See P.C. v. McLaughlin,* 913 F.2d 1033, 1040

(2d Cir.1990) (holding that mere failure to provide an appropriate education is not enough to defeat a qualified immunity defense and that plaintiff must show defendants' actions were clearly impermissible under the law at that time).

■ However, during the period in question, it was clearly established law that any arbitrary limit on early intervention services would be a violation of IDEA. If the policy alleged by plaintiffs existed, it did so in violation of clearly established law. *See Butler v. South Glens Falls Cent. School Dist.,* 106 F.Supp.2d 414, 421 (N.D.N.Y.2000) ("At the time of the defendants' action, IDEA clearly established a requirement that an IEP addressing the specific needs of the particular child must be adequately developed and implemented.")

■ A defendant is not individually liable for Section 1983 violations unless he or she is "personally involved in the unconstitutional conduct." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998). Although qualified immunity is not a shield for individuals who "knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Catanzaro v. Weiden,* 140 F.3d 91, 96 (2d Cir.1998), "a court will not engage in a subjective inquiry into a government employee's motivations in acting or refusing to act." *P.C. v. McLaughlin,* 913 F.2d at 1040.

■ Furthermore, to show personal responsibility, the general doctrine of respondeat superior does not suffice; a showing of personal responsibility is required. *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). The Second Circuit indicated four ways in which a defendant may be personally involved in a § 1983 violation: (1) the defendant may have directly participated in the infraction; (2) a supervisory official, after learning of the violation through a report

or appeal, failed to remedy the wrong; (3) a supervisory official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) a supervisory official was grossly negligent in managing subordinates. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

Even considering the facts in the light most favorable to plaintiffs, the evidence concerning Adel and Rapaport's involvement is insufficient to support a finding that brings them within any of the *Williams* categories. *See Geller v. Staten Island Developmental Center,* 1991 WL 99054 (N.D.N.Y. June 5, 1991) In *Geller,* an action on behalf of a mentally retarded child challenging the appropriateness of placement and treatment decisions by the supervisory personnel of defendant institutions, the court found that plaintiffs had failed to establish that the institution's chief psychologist played any role in the selection of I.Q. tests used on the boy, or that he had knowledge that those tests were being used. Here, there is no evidence that either Adel or Rappoport directly participated in or approved the formulation of the alleged policy. *See J.F v. School Dist. of Philadelphia,* 2000 WL 361866 (E.D.Pa. April 7, 2000) (finding no evidence that superintendent with responsibility for implementation of programs participated in, personally directed, or knew about and acquiesced in violations, when supervisor responded to complaint about a shortage of classrooms and teachers for autistic children by requesting more funding for following year). Adel and Rapoport can thus be liable for plaintiffs' § 1983 claims only in their official capacities.

I cannot summarily dismiss the claims against Yang–Lewis. If there was a ten-hour policy, anyone who was involved in creating or enforcing it is *ipso facto* liable. *See Butler v. South Glens Fall Cet. School Dist.,* 106 F.Supp.2d at 421 (finding defendants were not entitled to qualified immunity as it was not objectively reasonable for defendants to believe that failing to develop IEPs which contained required information did not violate plaintiffs' statutory rights). Whether or not Yang–Lewis was involved in developing or implementing any alleged policy is a disputed question of fact. She was aware of the ten-hour "policy" at or around the time it was developed, because she discussed the issue with Kaplan on a number of occasions, and she was copied on the Kaplan memo. Yang–Lewis gave her approval to Kaplan's proposal. She claims it was her intention that the number be a guideline, and that her understanding, from her discussions with Kaplan, was that to the extent a child's situation demanded more than ten hours of home-based ABA therapy that the county would provide it. She also says she did not see the Kaplan memo with the offending word "policy." Whether she is telling the truth is for a jury to determine.

As for Kaplan, the facts described at length above clearly show that she was primarily responsible for creating whatever policies or guidelines existed within the WCDOH from 1993–1996. If there was a policy, she can hardly claim qualified immunity.

d. *Monell* Claims

Local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to have violated federal law "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs must satisfy two requirements: (1) they must first prove the existence of a municipal policy or custom in order to show the municipality took some action that caused their injuries, and (2) the plaintiffs must establish a causal connection between the policy and the deprivation of their federal rights. *See Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d

Cir.1985). In the alternative, the actions complained of must be performed by a "municipal policymaker." *Annis v. County of Westchester*, 136 F.3d 239, 248 (2d Cir.1998).

■ To show the existence of a policy, plaintiffs must present evidence of either: (1) a formal policy which is officially endorsed by the municipality, *see Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiffs' civil rights, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policy-making officials, *see Monell* at 690–91, 98 S.Ct. 2018; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact, *see City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ Plaintiffs argue that no genuine issue of material fact exists as to whether or not the County pursued a policy of limiting the number of hours of ABA therapy available to children enrolled in the EIP. I disagree. The material facts in dispute include: (1) whether WCDOH supervisors intended that ten-hours for providing ABA therapy should serve as an inflexible upper limit rather than a guideline; (2) what Bovard and/or Kaplan communicated to WCDOH staff; and (3) whether staff who communicated to plaintiffs that there was a limit were speaking out of a misunderstanding about what Bovard and/or Kaplan said. Plaintiffs and defendants have offered conflicting deposition testimony with respect to these facts. A jury must decide which testimony to credit.

### 7. *Rehabilitation Act Claims*

a. Defendants' Motion for Summary Judgment on Plaintiffs' Rehabilitation Act Claims is Denied

Defendants' motion for summary judgment on plaintiffs' claims for compensatory damages was denied above as to EE and SS. Thus, they may still try these claims. All plaintiffs' claims for other damages under the Rehabilitation Act remain.

■ Plaintiffs argue that, if the County failed to provide appropriate services to eligible children under IDEA, it necessarily violated the Rehabilitation Act. This is not altogether true. The Rehabilitation Act provides in pertinent part:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). In order to prove a violation of the Rehabilitation Act, a plaintiff must show that: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in a particular program; (3) he was denied that participation based upon his disability; and (4) the program receives federal funds. *See D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998).

The Rehabilitation Act provides relief from discrimination, whereas IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination. Thus the scope of protection afforded under the two statutes is different. *See* Rehabilitation Act § 504, 29 U.S.C. 794 (prohibiting discrimination against an "otherwise qualified individual with a disability ... solely by reason of her or his disability."); *see also Castellano v. City of New York*, 142 F.3d 58, 70 (2d Cir.1998) (Section 504 of the Rehabilitation Act "prohibit[s] discrimination only on the basis of disability."). *But see W.B. v. Matula*, 67

F.3d 484, 492–93 (3d Cir.1995) (noting that regulations implementing § 504 adopt IDEA language requiring schools which receive federal funds to provide a FAPE to each qualified handicapped person).

■ Based on this distinction, other circuits have found that, in order to establish a Section 504 violation, a plaintiff must demonstrate bad faith or gross misjudgment in addition to the denial of a FAPE. *See Sellers v. School Bd. of Mannassas,* 141 F.3d 524, 529 (4th Cir.1998), *petition for cert. denied,* 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d 137, 67 U.S.L.W. 3083 (1998) (No. 98–79); *Monahan v. State of Nebraska,* 687 F.2d 1164, 1170 (8th Cir. 1982). Other New York district courts have required this finding. *See Wenger v. Canastota,* 961 F.Supp. 416, 422 (N.D.N.Y. 1997), *aff'd in part & vacated in part on other grounds,* 146 F.3d 123 (2d Cir.1998), *cert. denied* 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 363 (1999); *Butler v. South Glens Falls Cent. School Dist.,* 106 F.Supp.2d 414 (N.D.N.Y.2000); *Schuler v. Board of Educ. of Central Islip Union Free School Dist.,* No. 96–CV4702, 2000 WL 134346 (E.D.N.Y. Feb.1, 2000). *But see Mr. & Mrs. "B" v. Board of Educ. of Syosset,* No. CIV.A.96–5752–FB, 1998 WL 273025, at *5 (E.D.N.Y. Jan.15, 1998) (noting that in cases alleging denial of a FAPE, "the line between the Rehabilitation Act and the IDEA is rather blurred" and finding "few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition.").

As the Second Circuit has stated, § 504 "does not clearly establish an obligation to meet a disabled person's particular needs vis-a-vis the needs of other handicapped individuals, but mandate[s] only that services … not be denied [to a disabled person] because he is handicapped." *P.C. v. McLaughlin,* 913 F.2d 1033, 1041 (2d Cir.1990). Thus, "challenges to the allocations of resources among the disabled are disfavored." *Flight v. Gloeckler,* 68 F.3d 61 (2d Cir.1995). I therefore hold that in order to prevail on their Rehabilitation Act claims, plaintiffs must show bad faith or gross misjudgment on the part of the defendants.

I held in a February 28, 2000 order addressing the parties' various procedural claims that knowledge on the part of WCDOH supervisors that 10 hours per week of ABA therapy was inadequate, followed by a decision of those supervisors to limit ABA therapy to 10 hours despite that knowledge, would be evidence tending to show gross negligence or reckless indifference on the part of the County Defendants. *See B.D. v. DeBuono,* 193 F.R.D. 117, 134 (S.D.N.Y.2000). Plaintiffs have assembled evidence from which a finder of fact could conclude that defendants were aware of the benefits of a larger number of hours of ABA therapy and intentionally withheld more than ten hours from those plaintiff children for whom a greater number of hours was a necessity. This issue will have to be tried to a jury.

b. Plaintiffs' Rehabilitation Act Claims Do Not Apply to Individual Defendants

■ Defendants also argue that the Rehabilitation Act claims against the individual County defendants Adel, Rapoport, Yang–Lewis and Kaplan, must be dismissed because individuals are not liable under the statute. They are correct.

The Second Circuit has determined that Congress abrogated state sovereign immunity under both the American with Disabilities Act and the Rehabilitation Act, thereby permitting individuals to sue government entities under the Acts. *Kilcullen v. New York State Dept. of Labor,* 205 F.3d 77, 82 (2d Cir.2000), Thus, where plaintiffs are not barred by Eleventh Amendment sovereign immunity from suing the state directly, there is no justification for permitting claims against defendants in their official capacities. *Candelaria v. Cunningham,* No. 98 CIV. 6273, 2000 WL 798636 (S.D.N.Y. June 20, 2000) (dismissing inmate's ADA and Rehabilitation Act claims of indifference to

440

medical needs); *Shariff v. Artuz,* 2000 WL 1219381 (S.D.N.Y. Aug. 28, 2000) (same); *Hallett v. New York State of Correctional Services,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000) (same). Plaintiffs are therefore barred from bringing their Rehabilitation Act claims against the individual defendants.

The Rehabilitation Act claims will go forward against the County.

### CONCLUSION

For the above reasons:

1. BD, EE, PP, SS and their parents may proceed with their claims for declaratory relief under § 1983 against the County, Kaplan and Yang–Lewis in their personal and official capacities, and Adel and Rapaport in the official capacities, subject to the constraints noted above (e.g., EE and SS may only prevail on their claims for reimbursement if they can prove they were not told of their right to seek administrative relief);

2. EE, SS and their parents may proceed with their claims for compensatory damages under § 1983 against the County, Kaplan, and Yang–Lewis, and under the Rehabilitation Act against the County;

3. BD, EE, DD, SS and their parents may proceed with their other damages claims under § 1983 only against the County, Kaplan and Yang–Lewis;

4. All plaintiffs may proceed with their other damages claims under the Rehabilitation Act against the County.

This constitutes the order and decision of the court.